1

2

3

4

5

6

7                       UNITED STATES DISTRICT COURT

8                      NORTHERN DISTRICT OF CALIFORNIA

9

10   INGRID & ISABEL, LLC,                    Case No.  13-cv-01806-JCS
                          Plaintiff,
11              v.

12   BABY BE MINE, LLC, et al.,               **ORDER RE SUMMARY JUDGMENT**
                          Defendants.         Re: Dkt. Nos. 92, 98
13

14

15   **I.     INTRODUCTION**

16           On April 19, 2013, Plaintiff Ingrid & Isabel, LLC ("I&I," "Plaintiff") initiated this action

17   against Defendants Baby Be Mine Maternity, LLC ("BBM") and BBM's sole members and co-

18   founders, Helen Tekce ("Tekce") and Isabelle Gartner ("Gartner") (collectively, "Defendants").

19   Plaintiff alleges multiple counts of breach of contract, one count of violation of the Lanham Act,

20   and two California statutory and common counts of unfair competition.  Defendants subsequently

21   alleged counterclaims against Plaintiff for intentional interference with contractual relations, and

22   intentional and negligent interference with prospective economic advantage.  The parties brought

23   cross-motions for summary judgment, which are presently before the Court and which collectively

24   address all of the parties' claims and counterclaims.  Plaintiff moved for partial summary

25   judgment on its breach of contract claims and all of Defendants' counterclaims; Defendants

26   moved for summary judgment, or in the alternative, partial summary judgment, on all of Plaintiff's

27   claims and on Defendants' counterclaim for intentional interference with contractual relations.

28

United States District Court
Northern District of California

1    The motions came on for hearing August 29, 2014 at 9:30am.   For the reasons set forth

2    below, I&I's summary judgment motion is GRANTED in part and DENIED in part.   BBM's

3    motion is GRANTED in part and DENIED in part.

4

5    **II.    FACTS[1]**

6    **A.    Background**

7        Plaintiff and Defendants are in the business of selling belly bands, among other products.

8    "A belly band is a cloth band worn around a pregnant woman's waist."  Dkt. No. 101 (Joint

9    Statement In Support Of Parties' Motions For Summary Judgment) ("JSF") at ¶ 1.  Plaintiff

10   markets its line of belly bands under the trade names "Bellaband®" and "BeBand®," Dkt. No. 47

11   (First Amended Complaint) ("FAC") at 31; Defendants currently market BBM's line of belly

12   bands using the descriptor "Maternity Belly Band." *See* JSF at ¶ 36.

13       A belly band may be functional, decorative, or both.  *See* JSF at ¶¶ 10-11; Dkt. No. 98 at 2.

14   One potential function of a belly band is to hold up the pants or skirts of the pregnant woman

15   wearing the band.  *See* JSF at ¶¶ 10-11.  The elastic fabric holds in place pants or skirts that no

16   longer fit during the pregnancy and which would otherwise fall or slip down.  *See, e.g.*, Dkt. Nos.

17   98 at 3; 96-1 at 12.  Some belly bands are capable of holding up unbuttoned pants or skirts, and

18   thus allow a pregnant woman to wear her existing clothes, as opposed to larger sizes or special

19   "maternity" clothing, during at least the early phase of the pregnancy.  *See, e.g.*, Dkt. Nos. 92 at

20   12; 98 at 3; 96-1 at 12-13.  The size, shape, and composition of the belly band may affect its

21   ability to hold up the pregnant wearer's pants or skirts.  *Id.* at

22       Belly bands may also be worn for purposes other than holding up pants or skirts.  *See, e.g.*,

23   Dkt. No. 98 at 2-3.  They can be worn as a decorative item over or along with other clothing.  *Id.*

24   They can serve to cover undone buttons on a woman's clothing without functionally holding up

25   the undone item. *Id.*  Belly bands are also marketed to cover a pregnant women's exposed skin,

26   bridging the gap that might be created between her pants or skirt and her shirt or blouse.  *Id.*

27   _____

28   [1] This factual background is taken from the parties' Joint Statement In Support Of Parties' Motions
     For Summary Judgment, Dkt. No. 101 ("JSF") unless otherwise noted.

United States District Court
Northern District of California

This litigation stems directly from the settlement of two previous actions against Defendant by Plaintiff.  The first was a trademark infringement claim, in which Plaintiff's predecessor-in-interest, Ingrid & Isabel Inc. ("I&I Inc.") accused Defendants of infringing I&I Inc.'s common law trademark rights and of conduct in violation of 15 U.S.C. § 1125(a) (the Lanham Act).  FAC at 32.   Specifically, I&I Inc. alleged that Defendant's sale, offers for sale and advertising of maternity waist bands under the name "Belly Band" was confusingly similar to I&I Inc.'s "Bella Band" product.  *Id.* at 32.  That case was dismissed pursuant to a Trademark Settlement Agreement (the "TSA") in 2006.

In the 2008 litigation, I&I Inc. alleged claims for patent infringement and unfair competition against Defendants.[2]  I&I Inc. alleged violation of U.S. Patent No. 7,181,775 B2 ("the '775 Patent"), which includes claims for a belly band which "hold[s] the skirt or pants in place on the women's body" and which "retain[s] the pants or skirt in place."  That case was dismissed pursuant to a Patent Settlement Agreement (the "PSA") in 2009.  JSF ¶¶ 4, 8.

**B.    The TSA**

Paragraph 1 of the TSA states in relevant part:

> "Defendants hereby represent, covenant, and warrant to plaintiffs that defendants will cease and desist from using the term "Bella" in connection with defendants' sale, distribution, or marketing of Maternity Bands."

JSF ¶ 5; Dkt. No. 1 Ex. B.

**C.    The PSA**

Paragraph 1 of the PSA states in relevant part:

> Defendants' Future Advertising and Maternity Band Statements. Defendants and their Affiliates (as used herein, "Affiliates" means any corporation, partnership, joint venture, or other entity or person in which Defendants or any of them hold an equity position) shall include on their websites an express statement that Defendants' Maternity Bands are decorative and are to be used as a fashionable clothing accessory that is not intended to nor does it actually hold up skirts or pants while being worn in a comfortable, nonbinding fashion. Defendants agree to include an express statement on each webpage of any website that they control or in which they have an ownership interest and on which they advertise or sell their

---

[2] *Ingrid & Isabel, Inc., et al. v. Baby Be Mine, LLC*, Case Number CV-08-02554-JCS

United States District Court
Northern District of California

Maternity Bands that their Maternity Bands "are not intended to nor do they actually hold up skirts or pants." Defendants agree to clearly communicate that the purpose of their Maternity Bands is decorative (and this obligation may be satisfied with respect to magazine or other media publication advertisements by the inclusion of a statement that the Maternity Bands "are for decorative use"). . . Defendants agree to include a statement that their Maternity Bands are not designed to hold up skirts or pants on all of their product packaging and in Defendants' product descriptions, provided that Defendants may continue to use their existing packaging without modification for a period not to exceed -120 days after the suit is dismissed. Failure to comply with any provision of Paragraph 1 shall constitute a material breach of this Agreement.

JSF ¶ 10; Dkt. No. 1 Ex. A.

Paragraph 2.A of the PSA states in relevant part:

Function of Maternity Bands. Defendants agree that they will not . . . offer to sell, sell, market, promote, distribute or advertise Maternity Bands that hold up pants or skirts.

JSF ¶ 10; Dkt. No. 1 Ex. A.

Paragraph 2.B of the PSA states in relevant part:

Compliance by Defendants' Retailers, Vendors, Sales Representatives, and Agents. Defendants agree to provide written notification to all of their retailers, vendors, sales representatives, agents and any other individuals or companies acting for, on behalf of, or in concert with Defendants to comply with the provisions of this Paragraph 1. Defendants further agree to use commercially reasonable best efforts to insure that their retailers, vendors, sales representatives, agents, and any other individuals or companies acting for, on behalf of, or in concert with Defendants do not advertise, promote, sell or offer to sell its Maternity Bands for the purpose of holding up skirts or pants. However, Defendants will not be directly liable for the independent actions of those vendors, sales representatives, agents and any other individuals or companies that are not Affiliates of Defendants.

JSF ¶ 12; Dkt. No. 1 Ex. A.

Paragraph 4 of the PSA states in relevant part:

Defendants' Agreement Regarding Defendants' Use, Offer to Sell, Sale, Promotion, Distribution or Marketing of Maternity Bands. Defendants hereby represent, covenant and warrant to Plaintiffs that, following the execution of this Agreement by all Parties, Defendants shall not copy any of Plaintiffs' advertising, marketing and promotional copy or layout elements and materials, copying statements, ideas, or expressions used in Plaintiffs' advertising, promotional and marketing materials.

JSF ¶ 13; Dkt. No. 1 Ex. A.

4

**D.   BBM's websites**

Defendants continued to market and sell belly bands following the settlement agreements. Defendants marketed their belly bands on their website, www.babybeminematernity.com (the "BBM website"), JSF ¶ 26, as well as on a mobile website (the "mobile website") JSF ¶ 29.  "In August 2009, BBM instructed its web design[] [firm] to add a disclaimer to the website that 'Baby Be Mine Maternity Bands are not intended to nor do they actually hold up skirts or pants.'"  JSF ¶ 16.  It is also undisputed that BBM launched a new website design in September 2012, and the new website contained a disclaimer that states, "Baby Be Mine Maternity Bands are not intended to nor do they actually hold up skirts or pants."  JSF ¶ 19.  The disclaimer is located "at the bottom of the web pages under the copyright notice."  *Id.*

"BBM advertised the Maternity Bands on the mobile website, but did not have the Disclaimer on all of the mobile webpages."  *Id.* at ¶ 30.  "I&I first brought the lack of a disclaimer on the mobile website to BBM's attention at a February 25, 2014 deposition. BBM's counsel did not receive a written communication regarding this issue. The mobile website was subsequently disabled."  *Id.* at ¶ 31.

Defendants also had a page for BBM on Facebook.com. The parties do not agree as to how it was used with regard to marketing Defendants' belly bands.  Plaintiff alleges that Defendants "marketed the Maternity Bands on their Facebook.com page," and that the BBM Facebook.com page did not include a disclaimer that BBM's belly band "is not intended to nor does it actually hold up skirts or pants."  Dkt. No. 92 at 8.  Defendants claim that BBM's Facebook.com page is "devoted almost exclusively to gownies and other products unrelated to the belly band."  Dkt. No. 102 (Decl. of Helen Tekce) at ¶ 23, and maintains that BBM "has never sold bands directly from the Facebook.com page."  *Id.*

**E.   BBM's product descriptions**

The parties have entered into stipulations regarding the product descriptions on BBM's website, www.babybeminematernity.com.  The site:

> describes the White, Crème Brule, Glacier Gray, Simply Taupe, Dark Denim, Pink, Cocoa, Raspberry Rose, 2 Pack Special 1 White and 1 Black, and 3 Pack Special 1 White, 1 Black and 1 Crème Brule Maternity Band, Brown and Crème printed Maternity Band,

Black and White printed Maternity Bands . . . with the following language:

The belly band that grows with you! You don't have to worry about that in between stage when nothing fits, your regular clothes too small & maternity clothes too big! Designed with your comfort in mind this little beauty will cover any gaps between your tops & bottoms by adding length & cover those ugly elastic waistbands or unbuttoned pants. This fabulous belly band is a 'must have' at every stage of your pregnancy, is excellent postpartum to cover exposed skin when breastfeeding while still looking great in yummy colors.

JSF ¶ 26.  The parties also agree that:

Under the photograph of the Current Products is a section titled "Description" on BBM's website, which includes the following statements: "Conceal those unsightly elastic waistbands and expandable panes on maternity pants and skirts"; "Double your wardrobe. You don`t have to worry about that in between stage when nothing fits – your regular clothes are too small and your maternity clothes are too big"; "Keep your tummy under wraps as it becomes beautifully round - cover any gaps between your tops & bottoms"; "Wear your favorite pre-pregnancy clothes longer"; "Get back into prepregnancy clothes sooner after birth"; "Make your maternity clothing more comfortable instantly – just fold your waistband under your belly and cover with the belly band"; "Perfect while you recuperate postpartum and as a breastfeeding cover-up, too".

JSF ¶ 28.

It is also undisputed that, "Two bands sold on BBM's website as of June 11, 2014 – a solid black band, and a 'pink maternity belly band last years inventory' – include a statement in the product description that these bands 'are not designed to hold up skirts or pants.'"  JSF ¶ 27.

**F.    BBM's sales to Wayfair and Walmart**

In addition to selling its belly bands directly through its website, BBM also sold belly bands to Wayfair, LLC, a distributor and online retailer, which in turn sold BBM's belly bands to Wayfair's customers and partners.  Dkt. No. 102 at ¶27.  BBM signed a supplier contract with Wayfair on or about October 14, 2011. JSF at ¶ 37.  The contract states that BBM, as supplier, would sell belly bands and designer hospital gowns ("gownies") to Wayfair's customers and/or Partners.  *Id.*  BBM subsequently sold belly bands and gownies to Walmart, which was a Wayfair partner.  JSF ¶ 38.  Orders made by customers on Walmart's website were received by BBM through Wayfair and fulfilled by BBM.  Dkt. No. 102 at ¶ 29.

United States District Court
Northern District of California

Plaintiff's counsel contacted Walmart in May and accused it and BBM of infringing on Plaintiff's '775 Patent.  Dkt. No. 94-1.  Plaintiff later contacted Wayfair as well and described the parties' PSA and this ongoing action.  Dkt. No. 104-17.  Wayfair subsequently cancelled its supplier agreement with BBM and sales of Defendants' maternity belly bands through Wayfair and Walmart ceased in July 2013.  Dkt. No. 102 at ¶ 30.  Defendants allege that Plaintiff's contact with Walmart and Wayfair "caused Wayfair to cancel its Supplier Contract with BBM."  Dkt. No. 133 at 17.

## III.   RELEVANT PROCEDURAL HISTORY

### A.   Plaintiff I&I's Claims

On April 19, 2013, Plaintiff filed its Complaint.  Dkt. 1.  On February 4, 2014, Plaintiff filed its First Amended Complaint, asserting five breach of contract claims and three unfair competition claims.  Dkt. No. 47 (FAC).

1.  Count 1: Plaintiff alleged that Defendants breached Paragraph 2A of the Patent Settlement Agreement.

2.  Count 2: Plaintiff alleged that Defendants breached Paragraph 2B of the Patent Settlement Agreement.

3.  Count 3: Plaintiff alleged that Defendants breached Paragraph 1 of the Patent Settlement Agreement.

4.  Count 4: Plaintiff alleged that Defendants breached Paragraph 4 of the Patent Settlement Agreement.

5.  Count 5: Plaintiff alleged that Defendants breached Paragraph 1 of the Trademark Settlement Agreement.

6.  Count 6: Plaintiff alleged that Defendant engaged in unfair competition in violation of the Lanham Act

7.  Count 7: Plaintiff alleged that Defendant engaged in unfair competition in violation of California Business and Professions Code § 17200

8.  Count 8: Plaintiff alleged that Defendant engaged in unfair competition in violation of California common law.

**B.     Defendant BBM's Counterclaims**

On August 7, 2013, Defendant filed its Answer and Counterclaims.  Dkt. 1.  Defendant asserted three counterclaims:

1.  Counterclaim 1: Defendant alleged that Plaintiff intentionally interfered with Defendant's Contractual Relations

2.  Counterclaim 2: Defendant alleged that Plaintiff intentionally interfered with Defendant's Prospective Economic Advantage

3.  Counterclaim 3: Defendant alleged that Plaintiff negligently interfered with Defendant's Prospective Business Advantage

**C.     Motions for summary judgment**

On July 25, 2014 Plaintiff moved for partial summary judgment.  Plaintiff sought summary judgment as to liability on:

1.  Plaintiff's Counts 1-5; and

    a.  <u>Count 1</u>: Plaintiff argues that Defendants breached ¶ 2.A. of the PSA "by selling, offering to sell, marketing, promoting, distributing and/or advertising Maternity Bands that hold up pants or skirts."  Dkt. No. 92 at 12.  Plaintiff submits expert evidence that Defendants' bands have the capacity to hold up pants, and were actually found by women to hold up pants when tested and surveyed; and offers rhetorical analysis of Defendants' marketing, arguing that Defendants' language conveyed that its bands hold up skirts and pants.

    b.  <u>Count 2</u>: Plaintiff argues that Defendants breached ¶2.B of the PSA because "[w]ritten notice satisfying Defendants' obligations under Paragraph 2.B. of the PSA was not sent to all of Defendants' Agents."  Dkt. No. 92 at 16.

    c.  <u>Count 3</u>: Plaintiff argues Defendants breached ¶ 1 of the PSA by failing to include agreed-upon disclaimer language, which indicates BBM's bands are decorative and not designed to hold up pants or skirts, in all of Defendants' product descriptions, on its mobile website, on its Facebook.com page, and in its printed advertising materials.  Dkt. No. 92 at 15.

United States District Court
Northern District of California

    d.  <u>Count 4</u>: Plaintiff argues that Defendants breached ¶ 4 of the PSA by failing to instruct BBM's agents to not copy I&I's website and by expressly instructing them to copy BBM's website.  Dkt. No. 92 at 16-17.

    e.  <u>Count 5</u>: Plaintiff argues that Defendants breached ¶ 1 of the TSA "by using the term "Bella" in connection with Defendants' sale, distribution, or marketing of the Maternity Bands," including   Dkt. No. 92 at 17.

2.  Defendant's Counterclaims 1-3

    a.  <u>Counterclaim 1</u>: Plaintiff argues that Defendant cannot prove four of the five requisite elements of its claim for Intentional Interference with Prospective Economic Advantage.  Plaintiff also argues that its actions are protected by the litigation privilege under California Civil Code Section 47, and that its action were not expressly prohibited by the PSA.  Dkt. No. 92 at 18-19.

    b.  <u>Counterclaim 2</u>: Plaintiff argues that Defendants cannot prove "crucial elements of its Intentional Interference with Prospective Economic Relations Claim." Dkt. No. 92 at 19.  Plaintiff also argues that its actions are protected by the litigation privilege and constitutes fair competition.  *Id.* at 20.

    c.  <u>Counterclaim 3</u>: Plaintiff argues that Defendants cannot prove any of eight requisite elements of the Negligent Interference with Prospective Economic Relations claim, and that Plaintiff's actions are protected by the "litigation and fair competition privileges." Dkt. No. 92 at 21-22.

On July 25, 2014, Defendant moved for:

1.  Summary judgment on Plaintiff's claims 1-8:

    a.  <u>Count 1</u>: Defendants argue that they did not breach ¶ 2.A of the PSA because that clause only proscribed the sale of bands that were *designed*, *intended*, or *marketed* to hold up pants or skirts, not bands that *can* hold up pants or skirts. Dkt. No. 98 at 9-11.

b. <u>Count 2</u>: Defendants argue that they could not breach ¶ 2.B of the PSA because it is unenforceable as drafted, and contains an impermissibly vague "best efforts" clause. Dkt. No. 98 at 12-14.

c. <u>Count 3</u>: Defendants argue that they did not breach ¶ 1 of the PSA and that "Plaintiff's interpretation of ¶1 of the PSA is grossly overbroad, encompassing far more than was included or intended." Dkt. No. 98 at 16. Defendant argues they have been using "marketing language indicating traditional uses of a maternity band," and that the PSA should be interpreted to allow such marketing. *Id.*

d. <u>Count 4:</u> Defendants argue that they did not copy Plaintiff's website in breach ¶ 4 of the PSA, and that the PSA "does not impose liability on BBM for having marketing that happens to be similar." Dkt. No. 98 at 18-19. Defendants submit evidence that the BBM website's "designers looked to a variety of other web sites when suggesting examples, and that the elements eventually used were not copied from" Plaintiff. *Id.* at 20.

e. <u>Count 5:</u> Defendants argue that it never breached ¶ 1 of the TSA by purchasing keywords or adwords that included the word "Bella." Dkt. No. 98 at 21. Defendants submit evidence allegedly showing all they keywords they ever purchased. *Id.*

f. <u>Count 6:</u> Defendants argue that, "assuming the Lanham Act protects a website's 'look and feel' . . . [Plaintiff] still cannot show inherent distinctiveness, secondary meaning, or likelihood of confusion," which are requisite elements of Plaintiff's claim. Dkt. No. 98 at 22.

g. <u>Count 7:</u> Defendants argue that Plaintiff's state-law unfair competition claim under California Business and Professions Code Section 17200 must fail because Plaintiff cannot demonstrate a likelihood of confusion between Plaintiff's and Defendants' websites. Dkt. No. 98 at 24.

h. <u>Count 8</u>: Defendants argue that Plaintiff's common law unfair competition claim requires a showing of fraud, which Plaintiff fails to show through any submitted evidence.  Dkt. No. 98 at 24.

2. <u>Partial summary judgment on Defendant's counterclaim 1</u>: Defendants argue that Plaintiff intentionally interfered with Defendants' contractual relations with Wayfair first by telling Walmart that Defendants "had committed patent infringement, and again when [Plaintiff] claimed to Wayfair that BBM had breached the PSA."  Dkt. No. 98 at 25.

## IV.    ANALYSIS

### A.    Legal Standards

#### i.    Summary Judgment

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id.* "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."  *Anderson v. Liberty Lobby Inc., All* U.S. 242, 252 (1986). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255.

Partial summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The purpose of partial summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett,* 477 U.S. 317, 323-24 (1986).

1    When evaluating a motion for partial or full summary judgment, the court views the

2    evidence through the prism of the evidentiary standard of proof that would pertain at trial.

3    *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 255 (1986). The court draws all reasonable

4    inferences in favor of the non-moving party, including questions of credibility and of the weight

5    that particular evidence is accorded. *See, e.g. Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496,

6    520 (1991). The court determines whether the non-moving party's "specific facts," coupled with

7    disputed background or contextual facts, are such that a reasonable jury might return a verdict for

8    the non-moving party. *T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 631

9    (9th Cir.1987). In such a case, partial summary judgment is inappropriate. *Anderson,* 477 U.S. at

10   248. However, where a rational trier of fact could not find for the non-moving party based on the

11   record as a whole, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith*

12   *Radio,* 475 U.S. 574, 587 (1986).

13   When considering cross-motions for partial summary judgment or summary judgment, the

14   denial of one motion does not necessarily require the grant of another.  *See Atl. Richfield Co. v.*

15   *Farm Credit Bank of Wichita,* 226 F.3d 1138, 1147 (10th Cir. 2000). The motions must be

16   evaluated in accordance with the claim or defense which is the subject of the motion and in

17   accordance with the burden of proof allocated to each party.

18   **ii.    Breach of Contract**

19   Plaintiff's first five claims are for breach of contract.  *See* Dkt. No. 1 (FAC) at 13-18.

20   "Under California law, to prevail on a breach of contract claim, a plaintiff must show: (1) the

21   existence of a contract; (2) performance by the plaintiff; (3) a breach by the defendant; and (4)

22   damages." *Rivera v. Rivera,* 10-CV-01345-LHK, 2011 WL 1878015 (N.D. Cal. May 17, 2011),

23   *citing Careau & Co. v. Sec. Pac. Bus. Credit, Inc.,* 222 Cal.App.3d 1371, 1399, 272 Cal.Rptr. 387

24   (1990).

25   **iii.    Unfair Competition**

26   a.   Lanham Act- Section 43(a)

27

28

United States District Court
Northern District of California

12

Plaintiff's sixth cause of action is for unfair competition in violation of Section 43(a) of the Lanham Act. *See* FAC at 20. Section 43(a) of the Lanham Act creates a federal cause of action for unfair competition and prohibits the sale of goods by use of:

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C 1125(a)(1).

"To state a claim under section 43(a), plaintiff must demonstrate (1) that it possesses a valid, protectable proprietary interest in the trademark or trade name, and (2) defendant's use of its mark creates a 'likelihood of confusion' in the consuming public." *Chronicle Pub. Co. v. Chronicle Publications, Inc.*, 733 F. Supp. 1371, 1376 (N.D. Cal. 1989), *citing New W. Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1198-1202 (9th Cir.1979). "This cause of action has been extended to cover a product's 'trade dress'—a category that traditionally consisted of packaging, but in modern parlance includes the design and shape of the product itself." *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1173 (N.D. Cal. 2007); *see also Autodesk, Inc. v. Dassault Systemes SolidWorks Corp.*, 685 F. Supp. 2d 1001, 1012 (N.D. Cal. 2009). "Trade dress generally refers to the total image, design, and appearance of a product and may include features such as size, shape, color combinations, texture, or graphics." *Clicks Billiards, Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257–58 (9th Cir. 2001) (internal citations omitted). "If a seller uses a trade dress that is confusingly similar to a competitor's, that conduct is actionable as unfair competition under Section 43(a) of the Lanham Act." *Autodesk*, 685 F. Supp. 2d at 1012-13.

United States District Court
Northern District of California

13

1    "[U]under the Lanham Act, 15 U.S.C. [] 1125(a), the ultimate test is whether the public is

2    likely to be deceived or confused by the similarity of the marks." *New W. Corp. v. NYM Co. of*

3    *California, Inc.*, 595 F.2d 1194, 1201 (9th Cir.1979).  (citations omitted).  "Whether we call the

4    violation infringement, unfair competition or false designation of origin, the test is identical—is

5    there a 'likelihood of confusion?'"  *Id.*

6                        b.   California unfair competition claims (common law and California Business
                             and Professions Code Section 17200)

7           Plaintiff's seventh and eight causes of action are California state law unfair competition

8    claims.  Unfair competition in California is "any unlawful, unfair or fraudulent business act or

9    practice and unfair, deceptive, untrue or misleading advertising."  California Business and

10   Professions Code § 17200.   The Ninth Circuit "has consistently held that state common law

11   claims of unfair competition and actions pursuant to California Business and Professions Code §

12   17200 are 'substantially congruent' to claims made under the Lanham Act." *Cleary v. News Corp.,*

13   30 F.3d 1255, 1262-63 (9th Cir.1994) (citations omitted). Under the Lanham Act, Defendants are

14   prohibited from making a "false or misleading representation of fact" which "is likely to cause

15   confusion, or to cause mistake, or to deceive . . . ." 15 U.S.C. § 1125(a)(1)(A). Under California's

16   UCL, the test is whether Defendants engaged in any "unfair, deceptive, untrue or misleading

17   advertising," California Business & Professions Code § 17200, that was "'likely to deceive' the

18   reasonable consumer to whom the practice was directed." *South Bay Chevrolet v. General Motors*

19   *Acceptance Corp.,* 72 Cal.App.4th 861, 878, 85 Cal.Rptr.2d 301 (1999). The "ultimate test" in

20   both cases is whether the consumers of the good are "likely to be deceived . . . ." *Acad. of Motion*

21   *Picture Arts & Sciences v. Creative House Promotions, Inc.,* 944 F.2d 1446, 1457 (9th Cir.1991)

22   (internal quotations omitted); *see also Zeltiq Aesthetics, Inc. v. BTL Indus., Inc.*, 13-CV-05473-

23   JCS, 2014 WL 1245222 (N.D. Cal. Mar. 25, 2014).

24          iv.    **Intentional Interference With Contractual Relations**

25          The elements a plaintiff of a claim for intentional interference with contractual relations

26   are "(1) a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of

27   this contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5)

2  resulting damage." *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 960 P.2d 513

3  (1998).

4        **v.**    **Intentional or Negligent Interference With Prospective Economic Advantage**

5        The elements of a claim for intentional interference with prospective economic advantage

6  are 1) an economic relationship between the plaintiff and third party containing the probability of

7  future economic benefit to the plaintiff, 2) knowledge by the defendant of the existence of the

8  relationship, 3) intentional acts on the part of the defendant designed to disrupt the relationship, 4)

9  actual disruption of the relationship, and 5) damages to the plaintiff proximately caused by the acts

10  of the defendant. *Visto Corp. v. Sprogit Technologies, Inc.*, 360 F. Supp. 2d 1064, 1066 (N.D.

11  Cal. 2005) (*citing Della Penna v. Toyota Motor Sales USA, Inc.,* 11 Cal.4th 376, 389 (1995).

12        In addition, "a plaintiff seeking to recover for an alleged interference with prospective

13  contractual or economic relations must plead and prove as part of its case-in-chief that the

14  defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct

15  that was wrongful by some legal measure other than the fact of interference itself." *Della*

16  *Penna,* 11 Cal.4th 376, 393 (1995). California courts have held that independently wrongful

17  conduct includes "actions which are independently actionable, violations of federal or state law or

18  unethical business practices, *e.g.,* violence, misrepresentation, unfounded litigation, defamation,

19  trade libel or trade mark infringement." *PMC, Inc. v. Saban Entm't, Inc.,* 45 Cal.App.4th 579, 602

20  (1996).

21      **B.**    **Application of the Law to the Facts of the Case**

22        **i.**    **Breach of Contract**

23        Plaintiff alleges breach of four separate clauses of the PSA and breach of one clause of the

24  TSA.  The Court considers each in turn.

25           a.    Count 1: ¶ 2.A of the PSA

26        Plaintiff alleges that Defendant breached ¶ 2.A of the PSA, which provides that

27  Defendants "will not . . . offer to sell, sell, market, promote, distribute or advertise Maternity

28  Bands that hold up pants or skirts."  JSF at ¶ 11 (PSA ¶ 2.A, "<u>Function of Maternity Bands</u>").  The

United States District Court
Northern District of California

1    parties dispute the meaning of this paragraph.  Defendants argue that, "Taking the record as a

2    whole, the only reasonable interpretation of the PSA is that BBM agreed not to sell Maternity

3    Bands *designed* to hold up pants, and that it would not market bands as *made for the purpose of*

4    *holding up pants*."  Dkt. No. 133 at 2.  Plaintiff reads this provision as prohibiting Defendants

5    from marketing and selling belly bands that do, in fact, hold up pants or skirts.  The Court

6    GRANTS IN PART Plaintiff's Motion as to Count 1, and DENIES Defendant's Motion as to

7    Count 1.

8                                  1.   Parol evidence

9            Defendants encourage the Court to look beyond the paragraph as written and consider the

10   whole contract and the context of the settlement agreement negotiations.  Under California law,

11   the role of courts in construction of contract language is to determine "what the parties meant by

12   the words they used." *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d

13   33, 38 (1968).  By California statute, "[t]erms set forth in a writing intended by the parties as a

14   final expression of their agreement with respect to those terms as are included therein may not be

15   contradicted by evidence of any prior agreement or of a contemporaneous oral agreement" ("the

16   parol evidence rule").  Cal. Code Civ. Proc. Section 1856(a).  But the court may admit parol

17   evidence if the language of a contract is ambiguous, that is, if the language is "reasonably

18   susceptible" to the interpretation urged when considered in light of the evidence presented. *Winet*

19   *v. Price,* 4 App. Cal.4th 1159, 1165 (1992) (citing *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage*

20   *and Rigging Co.,* 69 Cal.2d 33, 37 (1968)); *see also* Cal.Civ.Proc.Code Section 1856(g). Even if

21   the Court does not, ultimately, conclude that parol evidence is admissible, it should consider

22   relevant parol evidence in making the threshold determination as to whether the language is

23   ambiguous. *Id*; *see also* <u>Intelligraphics, Inc. v. Marvell Semiconductor, Inc.</u>, C-07-2499 JCS, 2008

24   WL 3200212 (N.D. Cal. Aug. 6, 2008).

25          The disputed term is plain and unambiguous on its face: the contract as written prohibits

26   the marketing and sale of belly bands that *hold up pants or skirts*, not bands that were *designed* or

27   *intended* for that purpose.  However, in light of *Drayage*, the Court does not end its inquiry there,

28   and considers whether the term is "reasonably susceptible" to any other interpretation.

                                          16

United States District Court
Northern District of California

1      Defendants argue that the PSA allows them to continue selling their existing lines of

2  bands.  Dkt. No. 102 at 4.  Defendants argue that the bands being sold in 2014, which Plaintiff

3  alleges hold up skirts or pants in breach of ¶2.A., were "for all practical purposes, the same bands

4  being sold in 2009" at the signing of the PSA.  *Id.*  Defendants argue that "[i]f anything, the bands

5  became *less* likely to hold up pants because the bottom hem circumference *increased.*"  *Id.* at 4 n.2

6  (emphasis in original).  Because the PSA was intended to allow continued sales of Defendants'

7  bands in 2009, and its bands in 2014 were no more likely to hold up pants than in 2009,

8  Defendants argue that its 2014 bands cannot be the source of a breach of ¶2.A.

9      Moreover, Defendants claim that interpreting the disputed term without its suggested

10  additions—that the bands are "designed" or "intended" to hold up pants or skirts, and "marketed

11  as" holding pants or skirts—would render the contract "illusory or unenforceable."  Dkt. No. 98 at

12  11.  Defendants argue that without these additions,  the nonsensical alternative to Defendants'

13  interpretation is one for which a band that had even a remote possibility of holding up the pants or

14  skirt on at least one woman would necessarily be precluded as well.  The Court disagrees.

15      First, the contract language itself is not reasonably susceptible to the meaning Defendants

16  suggest.  Defendants point to paragraphs 1 and 4 of the PSA, in conjunction with the second

17  recital on page 1 of the PSA, to show that the parties agreed "that BBM could continue to sell

18  'Maternity Bands.'"  Dkt. No. 98 at 10.  Defendants note that the second recital of "[t]he PSA

19  defined 'Maternity Bands' to mean the 'maternity band products' that BBM was alleged in the

20  2008 Complaint to have manufactured, used, imported, distributed, offered for sale and sold," *id.*

21  (quoting PSA), but neglects to quote the rest of the recital that says that included bands

22  Defendants had sold "in the United States that infringed claims in U.S. Patent No. 7,181,775."

23  Dkt. No. 1, Ex. A at 1.  The PSA's definition of "Maternity Bands" is broad enough to include

24  bands that infringed the patent, bands that did not infringe the patent, bands that held up skirts or

25  pants, and bands that did not hold up skirts or pants.  Contrary to Defendants' position, the parties

26  clearly did not intend to agree that Defendant could sell or continue to sell bands that infringed

27  Plaintiff's patent.  Additionally, neither paragraph 1 nor paragraph 4 of the PSA says that

28  Defendant will "continue" selling its Maternity Bands.    Paragraph 2.A creates a limitation on the

17

United States District Court
Northern District of California

1  subset of those bands which Defendants is allowed to market and sell.  The Court will not interpret

2  the contract in such a way that would render meaningless ¶ 2.A.'s explicit prohibition on selling

3  bands that hold up skirts or pants.

4         Second, the extrinsic evidence weighs against Defendants' proposed interpretation of the

5  disputed term.  Plaintiff offers evidence that during negotiation of the PSA, Defendants suggested

6  modifications to the paragraph 2.A, including a suggestion that would have explicitly allowed

7  BBM to continue marketing and selling the style of belly bands that been "currently selling."  *See*

8  Dkt. No. 118-6.  The fact that the "grandfather" clause for BBM's belly band products at the time

9  was suggested demonstrates that the parties considered modifying the language but those

10 modifications did not survive into the final agreement.

11        Moreover, contrary to Defendants' contention, the Court need not give the hypothesized

12 nonsensical reading to the disputed term.  In the contract itself, the parties identified the

13 functionality that was prohibited in various sections: that the bands must have not just some

14 minimal capacity to hold up pants and skirts, but they be able to hold them up "in a comfortable,

15 non-binding fashion."  JSF at ¶10.  The Court rejects Defendants' request to construe the disputed

16 term "Bands that hold up pants or skirts" as meaning only bands that were intended to, designed

17 to, or marketed as being able to hold up pants or skirts.

18                    2.   Evidence that Defendants' bands hold up pants or skirts

19        The Court next considers whether Plaintiffs are entitled to summary judgment on the claim

20 that Defendants in fact breached ¶ 2.A of the PSA by selling, offering to sell, marketing,

21 promoting, distributing and/or advertising Maternity Bands that hold up pants or skirts.  Plaintiff

22 relies on three bases of proof for its claims.  First, Plaintiff offers the expert declaration of Dr.

23 Sarah Butler, who "conducted a consumer survey of 106 pregnant women who tried on, used and

24 evaluated the functionality of Defendants' Maternity Bands."  Dkt. No. 92 at 12.  Second, Plaintiff

25 offers the expert declaration of Haskell Beckham, who tested Defendants' Maternity Bands'

26 material composition, tension and stretch characteristics, and weight capacities under various

27 configurations mimicking their being worn by a pregnant woman.  *Id.*  Third, Plaintiffs analyzed

28 Defendants' marketing materials describing Defendants' belly bands and argue that "Defendants

United States District Court
Northern District of California

used code words and phrases to convey the functionality that their Maternity Bands would hold up clothing." *Id.*

Dr. Butler performed a study of 106 pregnant women, who were invited to bring two pairs of apparel bottoms to an interview and participate in an on-site wear test. Dkt. No. 92 at 4.  The women were split into two groups, and were asked to test either Defendants' Maternity Bands or a control maternity belly band that was not designed specifically to hold up pants or skirts." Dkt. No. 97 at ¶ 11.   The women were also asked to take the bands home, test them with their apparel bottoms, and fill out and return a questionnaire evaluating whether the bands held up either or both of the bottoms.  Dr. Butler compiled and evaluated the questionnaire responses as well as responses to an online survey.  Plaintiff argues that the questionnaire and survey results show conclusively that Defendants' belly bands hold up pants or skirts:

- 100% of the survey respondents (all 52) found Defendants' bands to hold up at least one of the two bottoms, as compared with 72% (39 out of 54) who found the control band to hold up at least one of the two bottoms.

- 81% of the women who tested Defendants' bands on site (42 of 52) indicated that it held up both pairs of garments, as compared with 44% of the participants (24 of 54) who tested the control product.

- None of the on-site survey respondents (0 of 52) said that Defendants bands did not hold up either of their apparel bottoms.  22% of the respondents (12 of 54) said the control product did not hold up either of their bottoms.

Dkt. No. 92 at 4-5; Dkt. No. 97 at ¶ 10; Dkt. No. 97-1 ("Butler Report") at ¶ 14.  Dr. Butler states that the difference in the percentage of respondents who said Defendants' bands held up both bottoms compared to the respondents who said the control band held up both bottoms is "statistically significant at the 99 percent level."  Butler Report at ¶ 43.

Dr. Butler asked test subjects who took the bands home to wear to respond to an online survey question that asked, "Does the product hold up pants?"  *Id.* at ¶ 46.

- 90% of the respondents who took home Defendants' band (47 of 52) answered, "Yes," and 10% (5 of 52) answered "No."  *Id.*

- 54% (29 of 54) who took home the control band answered "Yes," and 435 (23 of 54) answered "No." 4% (2 of 54) answered, "Don't know." *Id.*

Plaintiff additionally submitted written declarations from three subjects of Dr. Butler's wear-tests who reported on their personal experience wearing Defendants' bands. Dkt. No. 117 at 2. Amber Loring was provided a Size 1 black band, and stated:

> I wore the band provided to me with my own clothing for six days. I wore the band with maternity jeans and with regular, pre-pregnancy jeans and shorts when I was at home, at work and camping on vacation. When I was wearing the band, I walked, sat, stood and drove. *The band I tested held up my jeans and shorts. It actually was like my pants were buttoned, even though my pants were wide open, unbuttoned and unzipped.*

Dkt. No. 122 at ¶¶ 5-8 (emphasis added). Erika Johnson was provided a Size 2 black band, and stated:

> I wore the band provided to me with my own clothing for seven days. I wore the band with maternity khakis, maternity slacks and regular, pre-pregnancy jeans when I was at work. When I was wearing the band, I walked, sat, bent over and drove. *The band I tested held up all my pants and they felt more secure.* My pants dropped down quite a bit without the band.

Dkt. No. 123 at ¶¶ 5-7 (emphasis added). Sandy Donnelly was provided a Size 1 white band, and stated:

> I wore the band that I was given with my pre-pregnancy pants, jeans, and slacks. I also wore the band that I was given with my maternity jeans. I wore the band for 5 days and wore it while I walked, sat, and drove in my car. *The band I was given held up my pre-pregnancy pants, jeans, and slacks and my maternity jeans.*

Dkt. No. 124 at ¶¶ 4-5 (emphasis added).

Plaintiff's second source of expert testimony is the declaration and report of Dr. Haskell Beckham. Dkt. Nos. 96; 96-1. Dr. Beckham's study attempted to quantify the ability of Defendants' bands to hold up pants and skirts. Dr. Beckham evaluated the composition of Size 1 and Size 2 bands and their fabric weights, and tested their weight capacities when positioned on a cylinder meant to represent a pregnant woman. Dkt. No. 96 at ¶9. Dr. Beckham analyzed the weight capacity of the bands in a folded and unfolded configuration, as shown in Defendants' marketing images. Dkt. No. 96-1 at 7, 23 (Figure 8). He compared those weight capacities with

United States District Court
Northern District of California

the weight of a pair of woman's denim jeans in sizes 12, estimated at 1.1 pounds. *Id.* at ¶¶ 19-20. Dr. Beckham's concluded, in part, that:

- Calculated weight capacities of Baby Be Mine Belly Bands sizes 1 and 2 worn in [a] folded configuration by women wearing pre-pregnancy pant sizes from 0 to 12 exceed the combined weight of a woman's size 12 denim jeans plus the band.

- Calculated weight capacities of Baby Be Mine Belly Bands sizes 1 and 2 worn in [an] extended (unfolded) configuration by women wearing pre-pregnancy pant sizes from 0 to 12 exceed or are equal to the weight of a woman's size 12 denim jeans.

Dkt. Nos. 96; 96-1. Dr. Beckham concluded that "In all cases, the calculated weight capacities exceed or are equal to the weight of the outer garment or weight of the outer garment plus band. In all cases, the Belly Bands will hold up the weight of a woman's size 12 denim jeans or lighter garment." Dkt. No. 96-1 at ¶ 22 (footnote omitted).

Defendants rebut Plaintiff's expert declarations as being "irrelevant, inadmissible, and disputed." Dkt. No. 133 at 6, 7. Defendants do not offer any expert testing of their own, but instead make rhetorical and expert-based challenges to the methodologies and conclusions of Dr. Butler and Dr. Beckham, and question their interpretations of their data. *See* Dkt. No 133 at 6-8; Dkt. No. 115. Defendants' challenges to Dr. Butler's study include arguments that the sample size of her study was too small to yield statistically significant results; the control band in her study was not presented in the same conditions as Defendants' band; the test subjects and the research administrators knew what was being sought from them, tainting the results; and that Dr. Butler interpreted ambiguous statements such as "pants did not *sag*" to mean the bands *held up* the pants or skirts (emphasis added). Dkt. No. 133 at 8. Defendants additionally object to Dr. Butler's report under Fed. R. Evid. 702 arguing that the report is not based on sufficient facts or data, is not a product of reliable methods, and is untethered to the facts of the case. *Id.* at 21.

Defendants submit the declaration of Dr. Mary Lynn Realff to challenge Dr. Beckham's report. Dkt. No. 115. Dr. Realff critiques Dr. Beckham's report for its methodology and conclusions. Dr. Realff challenges Dr. Beckham's study on the bases that Dr. Beckham tested the

21

weight-capacity of the bands using a stationary cylinder as the model for the pregnant woman, as opposed to real-word conditions; that the study relied on a model of a woman's body during pregnancy derived from a case study that followed just one woman, and is therefore not generalizable; and that Dr. Beckham used unrealistic coefficients for calculating the friction of the bands and clothing they would theoretically hold up. *Id.*; Dkt. No. 133 at 7-8. Dr. Realff concludes that Dr. Beckham's conclusions are not reliable or made "to a reasonable degree of scientific and engineering certainty." Dkt. No. 115 at ¶ 25. Dr. Realff did not perform her own test of the bands to determine their weight capacity or offer her own empirical conclusions about the actual weight capacities of the bands. *See* Dkt. No. 115.

Defendants additionally object to Dr. Beckham's report under Fed. R. Evid. 702, arguing that Dr. Beckham's cylinder model are not based on sufficient facts or data, are unreliable, and would not aid a trier of fact; and under Fed R. Evid. 703, arguing that Dr. Beckham's use of the single case study to model how woman's body changes over pregnancy rendered the report inadmissible. Dkt. No. 133 at 21.

Plaintiff's third source of evidence for its argument that Defendant breached ¶ 2.A of the PSA, per Plaintiff's submitted interpretation, is that "Defendants have consistently marketed, promoted, advertised and offered to sell their Maternity Bands in such a way as to convey to the average consumer that their Maternity Bands would hold up pants or bottoms." Dkt. No. 92 at 13. Plaintiff cites to four examples of "statements made by Defendants touting the functionality of their Maternity Bands and their instructions to pregnant women to fold over" the bands, which Plaintiff argues "constitutes marketing, promoting and advertising bands that hold up pants or bottoms." *Id.*

The "code words and phrases" cited by Plaintiff, Motion at 13-14, are:

- "The Belly Band that grows with you!" JSF No. 26.
- "You don't have to worry about that in between stage when nothing fits, your regular clothes are too small & maternity clothes too big!" *Id.*
- "Double your wardrobe. You don't have to worry about that in between stage when nothing fits . . . ." *Id.*

- "Make your maternity clothing more comfortable instantly - just fold your waistband under your belly and cover with the belly band." *Id.*

Plaintiff argues that this marketing language employed suggests features and uses of Defendants' bands—such as "grow[ing] with" the wearer, being worn when "nothing fits," and "provid[ing] comfort"—that only make sense if the bands are understood to hold up pants or skirts.  Motion at 13-14.

Plaintiff offers no evidence that the "code words and phrases" led actual customers to believe that Defendants' bands hold up pants or skirts; nor does Plaintiff offer any expert analysis that this type of language would be likely to be understood as meaning that Defendants' bands hold up pants or skirts.  Defendants emphasize that the descriptive language that Plaintiff quotes includes no direct reference to holding up pants.  Dkt. No. 133 at 9.  Defendants conclude that "[n]o reasonable juror, unless predisposed to believing that a maternity band is sold only to hold up pants, would read the product description and conclude that BBM was marketing the bands to hold up pants." *Id.*  As to the "code words and phrases" argument, the Court agrees.

### 3.  Conclusions

Plaintiff has submitted three evidentiary bases to conclude that Defendant breached ¶ 2.A of the PSA by selling bands that hold up skirts and pants: (1) compiled survey results from pregnant women who actually tested whether the bands help up their skirts and pants, as well as declarations from three of them; (2) simulated weight-capacity testing of the bands in a laboratory setting; and (3) rhetorical analysis of Defendant's marketing language.

The Court finds that Defendants' bands hold up pants and skirts.  Plaintiff submits definitive evidence, in the form of Dr. Butler's report, the wear-test declarations, and Dr. Beckham's report, that proves the bands hold up pants and skirts.[3]  Dr. Butler's report indicated that 100% of the women testing the bands on-site had at least one of their two apparel bottoms held up by Defendants' bands, and 90% of the respondents concluded in their home-tests that the

---

[3] The Court finds that Dr. Butler's and Dr. Beckham's reports are admissible evidence; Defendants' objections, including those articulated by Dr. Realff, go to the weight of the evidence, not admissibility.

United States District Court
Northern District of California

bands held up their apparel bottoms. Each result was statistically significant and reflected a substantially greater percentage than reported by the respective control group. Those results are bolstered by the uncontroverted declaration testimony of Amber Loring, Erica Johnson, and Sandy Donnelly, who each stated that Defendants' bands held up their pants. The evidence is further supported by Dr. Beckham's conclusion that even Defendants' smaller-sized bands, worn folded or unfolded, have the weight capacity to hold up a woman's size 12 pair of jeans.

Defendants argue that unless its interpretation of ¶ 2.A of the PSA is adopted, the nonsensical result is that the PSA prohibits Defendants from selling and marketing any band that have only a remote possibility of holding up pants or skirts—including, as Defendants' counsel hypothesized at the hearing, "a silk scarf" tied tight enough. *See* Dkt. No. 158 at 31:13-23. Defendants' breach is not so minimal and technical. It is not some tiny, *de minimus* fraction of Defendants' bands that hold up pants and skirts, only under tortured circumstances. Plaintiff's evidence shows that Defendants' bands hold up pants and skirts 90%-100% of the time.

Defendants dispute much of Plaintiff's evidence but do not offer any evidence that contradicts it by showing, in any way, that Defendants' bands to *not* hold up pants or skirts. Because there is evidence that proves a breach, and Defendants have submitted no evidence to the contrary, the Court finds that there is no dispute of material fact as to whether Defendants; bands hold up pants.[4] Accordingly, Plaintiff's Motion is GRANTED as to Count 1's claim for breach of contract with respect to elements (1) the existence of a contract; (2) performance by the Plaintiff; and (3) a breach by Defendants. The Court denies summary judgment as to (4) damages, finding that a triable issue of fact exists as to the extent of Plaintiff's damages, if any. Defendants' motion as to Count 1 is DENIED.

      b.  Count 3: ¶ 1 of the PSA

---

[4] The Court finds that Plaintiff has proven that all sizes and colors of Defendants' bands hold up skirts or pants in breach of ¶2.A. Though expert testimony was only presented with regard to size 1 and 2 bands, Plaintiff presented evidence through its experts that modeled the weight capacity of the size 1 and 2 bands against the weight of pants expected to be at the heaviest end of the spectrum of pants worn by a woman who would fit into a size 1 or 2 band. Dkt. No. 137 at ¶ 5; Dkt. No. 96-1. Additionally, Defendants have not presented any argument that its bands of other sizes or colors would perform differently than the ones tested, or that any of its bands do not hold up pants or skirts.

Plaintiff moves for summary judgment on Count 3, arguing that there is no genuine dispute that Defendants breached paragraph 1 of the PSA. That motion is GRANTED in part. Defendants' motion is DENIED in part and GRANTED in part.

Paragraph 1 of the PSA imposes several obligations on Defendants to publish a disclaimer or otherwise disclose that its belly bands are decorative and are not designed to, and in fact do not, hold up skirts or pants. Plaintiff asserts four separate breaches as a basis for its summary judgment claim on Count 3:

> i.    Failure to state on all of BBM's websites and in all of BBM's product descriptions that BBM's maternity bands "are not designed to hold up skirts or pants."
>
> ii.   Failure to state on BBM's mobile page that BBM's maternity bands "are not designed to hold up skirts or pants."
>
> iii.  Failure to state on BBM's Facebook.com page that BBM's maternity bands "are not designed to hold up skirts or pants."
>
> iv.   Failure to include the statement that the Maternity Bands "are for decorative use" on all of their magazine or other media publication advertisements, including those in Elite [Magazine].

Dkt. No. 92 at 15-16.

### 1. Product descriptions

It is undisputed that BBM did not include the disclaimer in its product descriptions for over a dozen color variants of its maternity bands. *See* JSF ¶ 26. Defendants argue that the obligation to include the disclaimer in BBM's product descriptions only applied to its product packaging, and not to the descriptions on BBM's Website. Dkt. No. 133 at 11.

The Court finds Defendants' argument unconvincing. The language of the contract, though not consistently ordered and separated with regard to obligations referring to the website obligations referring to other marketing, unambiguously imposes an obligation to include the disclaimer language in Defendants' "product descriptions." Defendants have stipulated that the disclaimer was not included in its "product descriptions." JSF ¶ 26. Defendants' argument that "to require a less effective version of the same language a second time on any page advertising bands

would be redundant" Dkt. No. 133 at 11, falls flat, and reads the "and" out of the clause; the plain language of the contract term requires such redundancy.

The Court therefore finds that Defendants breached paragraph 1 of the PSA as to inclusion of the disclaimer in Defendants' product descriptions.  As to this claim, Plaintiff's motion is GRANTED with respect to elements (1) the existence of a contract; (2) performance by the Plaintiff; and (3) a breach by Defendants.  The Court denies summary judgment as to (4) damages, finding that a triable issue of fact exists as to the extent of Plaintiff's damages, if any.  Defendants' motion as to this claims is DENIED.

### 2.   Mobile website

It is undisputed that BBM maintained the mobile website to advertise, market, and sell the Maternity Bands, JSF ¶ 29, but did not have the disclaimer on all of the mobile webpages.  JSF ¶ 30.  Plaintiff moves for summary judgment on the basis of this breach.  However, in order to have a legal remedy for breach of ¶ 1 of the PSA, Plaintiff is required under ¶ 3 of the PSA to email or fax Defendants' counsel, "[s]hould Plaintiffs subsequently discover that Defendants . . . are in breach of any of the provisions of Paragraph I of this Agreement in connection with Defendants' use, offer to sell, sale, promotion, distribution or marketing of Maternity Bands."  PSA ¶ 3.  It is undisputed that Plaintiffs did not email or fax Defendants about the failure to include the disclaimer on the mobile webpages.  JSF ¶ 31.  Instead, Defendants learned of the alleged breach at a February 25, 2014 deposition in a non-written communication, and subsequently disabled the mobile webpages.  *Id.* Defendants raise this defense in their Opposition to Plaintiff's motion for summary judgment.  Dkt. No. 133 at 12.  Plaintiff does not rebut this defense against the alleged breach in Plaintiff's Reply and instead merely reiterates an undisputed description of the breach. *See* Dkt. No. 135 at 8.

The Court therefore finds that Plaintiff has no claim for Defendants' failure to include the disclaimer on its mobile website because Plaintiff failed to inform Defendant of the breach as required by ¶ 3 of the PSA.  As to this claim, Plaintiff's motion is DENIED, and Defendants' motion is GRANTED.

### 3.   Facebook.com page

United States District Court
Northern District of California

Plaintiff alleges that Defendants "marketed the Maternity Bands on their Facebook.com page," and that the BBM Facebook.com page did not include a disclaimer that BBM's belly band "is not intended to nor does it actually hold up skirts or pants."  Dkt. No. 92 at 8; *see also* Dkt. No. 93-1 (screenshots of BBM's Facebook.com page with posts mentioning BBM's belly bands). Defendants admit that "BBM did have a few rare posts referencing belly bands," but maintains that BBM "has never sold bands directly from the Facebook.com page." Dkt. No. 102 (Decl. of Helen Tekce) at ¶ 23.  Defendants claim that BBM's Facebook.com page is "devoted almost exclusively to gownies and other products unrelated to the belly band."  *Id.*  Defendants claim that if a customer ever clicked on a link in BBM's Facebook.com posts, "she would have been directed back to the website" which included the disclaimer.  Dkt. No. 133 at 12.

Defendant additionally present the same defense against this alleged breach as it does against the alleged breach for failure to include the disclaimer on its mobile webpages: Plaintiff "did not email or fax Defendants about the alleged breach as required by ¶ 3 of the PSA.  Opp. at 12 (Plaintiff "first informed BBM's counsel about the Facebook posts at the February 25, 2014 deposition and did not send BBM the written notification required by ¶3").   Defendants state that "BBM also has not posted about Maternity Bands on its Facebook page since the deposition."  *Id.* The parties did not jointly stipulate to the timeline of non-written disclosure of the alleged breach and the subsequent cure in their pleadings or in the JSF.  However, Plaintiff conceded at the hearing that it did not notify Defendants of the alleged marketing without disclaimer on Defendants' facebook.com page until a deposition in November or December.  Dkt. No. 158 (Hr'g Tr.) at 17:1-17.  *See* Dkt. No. 100.  Plaintiff also conceded that it never gave Defendants written notice of the alleged breach.  *Id.* at 18:7-8.

The Court therefore finds that Plaintiff has no claim for Defendants' failure to include the disclaimer on its Facebook.com page because Plaintiff failed to inform Defendant of the breach as required by ¶ 3 of the PSA.  As to this claim, Plaintiff's motion is DENIED, and Defendants' motion is GRANTED.

4.   Magazine or other media publication advertisements

United States District Court
Northern District of California

United States District Court
Northern District of California

Plaintiff alleges that Defendants "reviewed and approved a final design proof for an advertorial for the Maternity Bands in Elite Magazine that did not contain the Disclaimer or any words referencing that the bands were for decorative use." Dkt. No. 92 at 15; Dkt. No. 93 ¶ 14; Dkt. No. 93-13 (Ex. M). Plaintiff also alleges that Defendants "marketed the Maternity Bands in catalogs and postcards at tradeshows without a statement that the Maternity Bands 'are for decorative use.'" Dkt. No. 92 at 15; Dkt. No. 93 ¶ 15; Dkt. No. 93-14 (Ex. N).

Plaintiff's argument and attached evidence do not establish a breach. As Defendants point out, Plaintiff's exhibits are final proofs and drafts of publication materials; they are not direct evidence of the publications themselves or of marketing shown to consumers. Dkt. No. 133 at 12-13. As the request at issue applies to actual advertisements, there is no evidence that Defendants actually breached its duty to include the disclaimer text in its actual printed publication material.

The Court therefore finds that Plaintiff has no claim that Defendants failed to include the disclaimer on all of their magazine or other media publication advertisements, including those in Elite Magazine. As to this claim, Plaintiff's motion is DENIED and Defendants' motion is GRANTED.

### 5. Conclusion

Accordingly, Plaintiff's Motion is GRANTED as to Count 3's claim for breach of contract of ¶ 1 of the PSA with respect to elements (1) the existence of a contract; (2) performance by the Plaintiff; and (3) a breach by Defendants with regard to the product descriptions. The Court declines to enter summary judgment as to (4) damages, finding that a triable issue of fact exists as to the extent of Plaintiff's damages, if any.

Plaintiff's Motion is DENIED as to Count 3's claim for breach of contract of ¶ 1 of the PSA with respect to:

1. The mobile website

2. The Facebook.com page

3. Printed publications

Defendants' Motion is GRANTED as to Count 3's claim for breach of contract of ¶ 1 of the PSA with respect to:

1.   The mobile website

2.   The Facebook.com page

3.   Printed publications.

   c.   Count 2: ¶ 2.B of the PSA

Plaintiff moves for summary judgment on Count 2, arguing that there is no genuine dispute

that Defendants breached paragraph 2.B of the PSA.  The motion is DENIED.  Defendants move

for partial summary judgment on Count 2, arguing that the undisputed facts demonstrate that

Defendants did not breach the notification requirement and that the provision is unenforceable as

drafted.  The motion is GRANTED.

  Paragraph 2.B of the PSA reads in full:

> Compliance by Defendants' Retailers, Vendors, Sales
> Representatives, and Agents. Defendants agree to provide written
> notification to all of their retailers, vendors, sales representatives,
> agents and any other individuals or companies acting for, on behalf
> of, or in concert with Defendants to comply with the provisions of
> this Paragraph 1. Defendants further agree to use commercially
> reasonable best efforts to insure that their retailers, vendors, sales
> representatives, agents, and any other individuals or companies
> acting for, on behalf of, or in concert with Defendants do not
> advertise, promote, sell or offer to sell its Maternity Bands for the
> purpose of holding up skirts or pants. However, Defendants will not
> be directly liable for the independent actions of those vendors, sales
> representatives, agents and any other individuals or companies that
> are not Affiliates of Defendants.

JSF ¶ 12.  Plaintiff's only factual allegation regarding paragraph 2.B in its motion for summary

judgment is that "Written notice satisfying Defendants' obligations under Paragraph 2.B. of the

PSA was not sent to all of Defendants' Agents."  Dkt. No. 92 at 16.  Plaintiff cites to a supporting

declaration from Plaintiff's counsel, which repeats the allegation.  Dkt. No. 93 at 20 ("Written

notice has not been produced which demonstrates that Defendants sent the requisite notice to all of

Defendants' Agents informing them of Defendants' obligations under the PSA.").  Plaintiff refers

to its recitation of facts, Dkt. No. 92 at 9-10, for further support.  This section repeats the

allegation that Defendants have not sent the requisite notification, and claims that the failure to

notify "allows potential customers to directly link to Defendants' retailers that do not have the

Disclaimer on their websites to purchase Defendants' Maternity Band."  *Id.* at 9.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Defendants present two defenses to Plaintiff's claim.  First, Defendants claim the provision

2    is unenforceable as drafted.  Defendants argue the meaning of the paragraph is unclear:

3           Paragraph 2.B demands that defendants give notice "to all of their
            retailers, vendors, sales representatives, agents" et al. "to comply
4           with the provisions of *this* Paragraph 1" (emphasis added), despite
            the fact that the sentence appears in paragraph 2. Even if the word
5           "this" were a typographical error, the meaning would be unclear
            because ¶1 simply does not impose any obligations on BBM's
6           retailers, vendors, sales representatives, agents" et al. There are four
            obligations set out in ¶1, and none are obligations to be undertaken
7           by anyone other than BBM or its "Affiliates." *(Id.)* The meaning of
            this obligation is also unclear because it does not specify with which
8           provisions of ¶1, if any, the third parties are to comply.

9    Dkt. No. 98 at 13.  Defendants argue that the provision as written is likely a holdover from a

10   previous draft of paragraph 1 that included an obligation for "Defendants *and their retailers,*

11   *vendors, sales representatives and agents*" to display the disclaimer on their websites.  *Id.*

12         The Court disagrees, in part because Defendants go on to present substantial evidence that

13   they did, in fact, send "written notification to every retailer, vendor, sales representative, agent,

14   and any other person or entity selling its Maternity Bands that its Maternity Bands do not hold up

15   pants."  Dkt. No. 133 at 14.  Defendant Gartner describes how, following the 2008 action's

16   settlement, she and Defendant Tekce "researched the contact information for all of our retailers,

17   vendors, sales representatives, agents, and for any other people selling or marketing belly bands on

18   our behalf," and "then went to a website called 'My Emma' and through the website sent out the

19   newsletter to all of those contacts."  Dkt. No. 99 at ¶ 3.  The newsletter Defendants sent included a

20   section that stated:

21          We are pleased to announce that the suit brought by Ingrid and
            Isabel Inc. has been settled on favorable terms to Baby Be Mine
22          Maternity. As part of the settlement we agreed to notify you that the
            Baby Be Mine Maternity Bands are for fashion use and are not
23          intended to nor will they hold up pants or skirts.

24   Dkt. No. 99-1 at IAI-039215.  Defendants indicate that they closed their "My Emma" account in

25   2011, before anticipation of this litigation, and therefore do not have access to the actual

26   communications send through that website.  Dkt. Nos. 99 at ¶ 4; 99-2.

27         Defendants state that four months after sending the newsletters, Plaintiff's counsel wrote to

28   Defendants' counsel "about the disclaimers on certain vendors' websites," and "BBM sent the

vendors [Plaintiff's counsel] was concerned about a second written notification that 'Baby Be Mine Maternity Bands are for fashion use and not intended to nor will they hold up pants or skirts.'" Dkt. No. 98 at 5; Dkt. No. 102 (Tekce Decl.) at ¶17.  The second notice, sent in January 2010 by email to four recipients and physically mailed to a fifth, stated in part, "By the way, we are pleased to announce that the suit brought by Ingrid & Isabel Inc. has been settled in favorable terms to Baby Be Mine Maternity. As part of the settlement we agreed to notify you that the Baby Be Mine Maternity Bands are for fashion use and not intended to nor will they hold up pants or skirts." Dkt. No. 102-15 at BBM.IAI 003715.  Defendants states that "BBM continued to inform vendors that its belly bands are not designed to hold up pants or skirts" Dkt. No. 98 at 5 n.2, and provides two examples. Dkt Nos. 102-16 (email to "the pretty company" in which Defendant Tekce writes, "as long as its [sic] doesn't say hold up your pants or skirts you can use it"); 102-17 (email to contactus@luxematernity.com from sales@babybeminematernity.com that states, "every band states on the back: 'This product is not designed to hold up pants or skirt.' This phrase is not currently on your site and it MUST be!!! Please fix this as soon as possible!").

In its Reply in support of its summary judgment motion, Plaintiff disputes Defendants' claim that the notification was sent to every retailer, vendor, sales representative, and agent to whom Defendant was required to send it.  Dkt. No. 135 at 9.  Plaintiff cites Defendant Tekce's deposition in which she allegedly "testified that she 'did not know' if Defendants sent a notification of Defendants' obligations under ¶ 2B to Volusion, Defendants' website designer and ecommerce provider for the past two years," "that she did not recall when or to whom they sent the notice," did not know "whether Defendants informed the press . . . that the Maternity Band is not intended to hold up pants/skirts," and "did not contact the press about conveying the decorative purpose of the Maternity Band." *Id.* In fact:

- Defendant Tekce testified that she did not *recall* if she ever informed Volusion about the patent settlement agreement. Dkt. No. 119-1 (Tekce Dep. Tr.) at 437:15-19. Defendant Tekce's declaration in support of Defendants' motion for summary judgment stated that, "Shortly after the PSA was signed BBM instructed its website

United States District Court
Northern District of California

1    designer to put disclaimer language onto the website." Dkt. Nos. 102 at ¶ 13; 102-

2    9 (email to website designer containing disclaimer).

3    •   When asked, "[W]hich vendors did you send this notice to," Defendant Tekce

4        responded, "I can't recall, *everybody that we were selling to at that time*." Tekce

5        Dep. Tr. at 244:9-10.

6    •   Defendant Tekce testified that, "[W]hen we signed the settlement agreement, we

7        had to send an E-Mail to every one of our vendors, which we did." *Id.* at 2443-5.

8    •   Plaintiff's citation for the claim that Defendants "did not contact the press about

9        conveying the decorative purpose of the Maternity Band" actually reads, "Q. Has

10       Baby Be Mine created a routine or process to regularly monitor press and/or online

11       sellers to make sure that there is compliance with the patent settlement agreement?

12       A. No." *Id.* at 251:4-8.

13   The evidence shows that Defendants did not breach ¶ 2.B of the PSA. Defendants

14   provided evidence of compliance. Plaintiff introduces no affirmative evidence of Defendants'

15   non-compliance and at most raises questions about whether the disclaimer was sent to all required

16   parties. Defendants submit evidence showing that it was.   Accordingly, Plaintiff's motion is

17   DENIED as to Count 2's claim for breach of contract of ¶ 2.B of the PSA. Defendants' motion is

18   GRANTED as to Count 2's claim for breach of contract of ¶ 2.B of the PSA.

19                      d.  Count 4: ¶ 4 of the PSA

20   Plaintiff moves for summary judgment on Count 4, arguing that there is no genuine dispute

21   that Defendants breached paragraph 4 of the PSA. The motion is DENIED. Defendants move for

22   partial summary judgment on Count 4, arguing that there is no evidence that Defendants "copied"

23   Plaintiff's website and no prohibition on Defendants having marketing "that happens to be

24   similar" to Plaintiff's. Dkt. No. 98 at 18. The motion is DENIED.

25   Paragraph 4 of the PSA centers on Defendants' agreement to "not copy any of Plaintiffs'

26   advertising, marketing and promotional copy or layout elements and materials, copying

27   statements, ideas, or expressions used in Plaintiffs' advertising, promotional and marketing

28   materials" and to "provide express written notification to all of their retailers, vendors, sales

United States District Court
Northern District of California

representatives, agents and any other individuals or companies acting for, on behalf of, or in concert with Defendants" regarding paragraph 4." JSF ¶ 13.

Plaintiff presents evidence that Defendants did explicitly instruct some vendors that Defendants wanted BBM's Website to share some visual elements and concepts with Plaintiff's website. *See* Dkt. No. 92 at 16-17; 10-11; Dkt. No. 93 Exs. J, K, L, S. Plaintiff's evidence, including photographic comparisons of the parties' marketing material, raises a triable issue as to whether Defendant breached paragraph 4. Defendant argues that "¶4 of the PSA prohibits "copying . . . it does not impose liability on BBM for having marketing that happens to be similar" to Plaintiff's marketing. Dkt. No. 98 at 18-19. A jury will have to decide whether the similarities amount to copying under the agreement. For that reason, both parties' motions for summary judgment as to Count 4 are DENIED.

### e.   Count 5: ¶ 1 of the TSA

Plaintiff moves for summary judgment on Count 5, arguing that there is no genuine dispute that Defendants breached paragraph 1 of the PSA. Defendant moves for summary judgment as well, arguing there is not no genuine dispute that Defendants did not breach. Plaintiff's motion is DENIED and Defendants' motion is GRANTED.

Paragraph 1 of the TSA reads: "Defendants hereby represent, covenant, and warrant to plaintiffs that defendants will cease and desist from using the term "Bella" in connection with defendants' sale, distribution, or marketing of Maternity Bands." JSF ¶ 5. Plaintiff alleges that Defendant breached Paragraph 4 by purchasing advertising keywords from Google, Amazon, and possibly other websites, including the keywords: "Ingrid bella band," "Discount bella band," "Ingrid sabel bella band," "Bella band maternity," "Bella band pregnancy," "Bella bands," "Bella band," and "The bella band." *Id.* at 32; FAC at 30, 34, 36. Plaintiff offers two bases for its claim. First, in its own summary judgment motion, Plaintiff argues that searching for the word "bellaband" on Google produced, among other search results and ads, and ad for Baby Be Mine. Dkt. No. 92 at 17; *see* Dkt. No. 118 ¶ 20; Dkt. No. 119-18 (screenshot of Google search). Second, in its Opposition to Defendants' summary judgment motion, Plaintiff references a "report generated by keywordspy.com" which allegedly "shows that Defendants purchased and/or used

1 the term 'Bella.'" Dkt. No. 117 at 16.  Plaintiff references the alleged report in the Declaration of

2 Ilene H. Goldberg in support of Plaintiff's Opposition.  Dkt. Nos. 119 at ¶ 21; 119-19 (screenshot

3 of alleged report).

4       Plaintiff also claims that Defendants breached by failing to notify Wayfair to *not* use the

5 term "Bella" in its sale, distribution, or marketing of Defendants belly bands.  Dkt. No. 92 at 17.

6 Plaintiff submits evidence that a Wayfair representative sent Defendants an email that said,

7 "provide me a list of key words that you do NOT want us bidding on for your brand.  Once get

8 that from you I'll pass it along to our paid search team."  Dkt. Nos. 93 at ¶ 17; 93-16.  Defendants

9 apparently responded with a list of terms that included "Bellaband," "Bella band," "Beband,"

10 "Tummy sleeve," "Bella band pregnancy," and "Maternity bella band," but not just "Bella."  Dkt.

11 Nos. 93 at ¶ 18; 93-17.

12       Defendant responds by submitting evidence of its search marketing purchases that do not

13 include the word "Bella."  Defendants notes that the parties stipulate that Defendants never bought

14 any keywords from Amazon.  JSF at ¶ 33.  Defendant Tekce testified by declaration that "[t]he

15 only time BBM has purchased keywords or adwords has been through the Google adwords

16 program," using "the company's one adwords account: sales@babybeminematernity.com," and

17 submits a screenshot that allegedly shows the adwords purchase history for that account.  Dkt.

18 Nos. 102 at ¶ 25; 102-22 (screenshot showing list of search terms, which does not include

19 "Bella").  Defendant Tekce additionally testifies:

20         BBM never purchased any of the following keywords or adwords
        from Google, Amazon, or from any other website: Bella, Maternity

21         bella band, Ingrid bella band, Discount bella band, Ingrid isabel
        bella band, Bella band maternity, Bella band pregnancy, Bella

22         bands, Bella band, The bella band, or Be band. I am not aware of
        anyone ever purchasing those keywords or adwords on our behalf,

23         and I have never instructed anyone to do so.

24 Dkt. No. 102 at ¶ 26.

25       In response to Plaintiff's claim that Defendants failed to notify Wayfair to not use the term

26 "Bella," Defendants argue that Plaintiff "presents no evidence that Wayfair actually bid for 'Bella'

27 that such bid was successful."  Dkt. No. 133 at 17.  Defendants argue that Plaintiff's claim with

28 regard to Wayfair is speculative.  *Id.*  At the hearing, Defendants also objected to Plaintiff's use of

the keywordspy report, on the basis that it was not authenticated or otherwise explained.  Dkt. No. 158 at 22:10-23:2.

The Court finds that the alleged keywordspy report is inadmissible hearsay and inadmissible expert testimony.  Plaintiff offers the contents of the keywordspy report for their truth, and identifies no exception to the hearsay rules that would allow their admissibility.  *See* Fed. R. Ev. 801-803.  Moreover, the report's contents are purportedly a list of search terms Defendants bid on, including the word "Bella," apparently determined by analyzing where Defendants' ads appear and in response to which search terms.  The only authentication provided for the report is the declaration of Plaintiff's counsel that it "is a true and correct copy of a report generated by keywordspy.com on January 18, 2013."  Dkt. No. 119 at ¶ 21.  Counsel does not, and cannot, explain how the report was generated or its methodology.  This is, at the very least, an expert report that cannot be admitted without the foundation required under the rules of evidence.  *See* Fed. R. Ev. 702.

With the keywordspy report excluded, the only remaining evidence presented by Plaintiff are the Google search screenshots and the allegation that Defendants failed to alert Wayfair to not use the term "Bella."  Neither creates a triable issue of fact that Defendants did, in fact, use the term Bella.

Accordingly, Plaintiff's motion as to Count 5 is DENIED.  Defendants' motion as to Count 5 is GRANTED.

### ii.    Counts 6-8: Unfair Competition

Defendant moves for summary judgment on Counts 6-8, arguing that there is no genuine dispute that Plaintiff "cannot show inherent distinctiveness, secondary meaning, or likelihood of confusion."  Dkt. No. 98 at 22.  Defendants' motion for summary judgment as to Plaintiff's Counts 6-8 is DENIED.

Plaintiff's Counts 6-8 are for unfair competition, under § 43(a) of the Lanham Act (Count 6), § 17200 of the California Business & Professional Code, and California Common Law.  FAC at ¶¶ 71-97.  The Ninth Circuit "has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are

1   'substantially congruent' to claims made under the Lanham Act." *Cleary v. News Corp.,* 30 F.3d

2   1255, 1262-63 (9th Cir.1994) (citations omitted).  The Court thus considers Plaintiff's three claims

3   and Defendants' motion for summary judgment on them together.

4       Section 43(a) of the Lanham Act creates a federal cause of action for unfair competition

5   and prohibits the sale of goods by use of:

6           [a]ny person who, on or in connection with any goods or services, or
    any container for goods, uses in commerce any word, term, name,

7           symbol, or device, or any combination thereof, or any false
    designation of origin, false or misleading description of fact, or false

8           or misleading representation of fact, which—

9           (A) is likely to cause confusion, or to cause mistake, or to deceive as
    to the affiliation, connection, or association of such person with

10           another person, or as to the origin, sponsorship, or approval of his or
    her goods, services, or commercial activities by another person . . . .

11   15 U.S.C 1125(a).  To successfully maintain an action for . . . false designation of origin [or]

12   unfair competition under the Lanham Act or California law, plaintiff must show that it has a valid

13   trademark and that defendant's use of the mark is likely to cause confusion.  *Vallavista Corp. v.*

14   *Amazon.com, Inc.*, 657 F. Supp. 2d 1132, 1136 (N.D. Cal. 2008).  The definition of the actionable

15   elements in Section 43(a) has been held to include trade dress.  *Autodesk, Inc. v. Dassault*

16   *Systemes SolidWorks Corp.*, 685 F. Supp. 2d 1001, 1012 (N.D. Cal. 2009)

17       Plaintiff alleges three bases for its Lanham Act claim: (1) Defendants' use of the "code

18   words and phrases" on its website; (2) Defendants' alleged use of the word "Bella" in its

19   marketing; and (3) Defendants' alleged copying of Plaintiff's "trade dress, the look and feel of the

20   website."  *See* Dkt. No. 158 (Hr'g Tr.) at 18:14-20:21.

21       Only Plaintiff's third basis warrants significant discussion.  Plaintiff's primary argument

22   regarding the "code words and phrases" is that they led consumers to believe that Defendants'

23   bands hold up pants or skirts in breach of ¶ 2.A of the PSA; the Court finds that Plaintiff presented

24   no evidence that the "code words and phrases" are likely to lead any consumer to reach that

25   conclusion.  Plaintiff has presented no evidence that the "code words and phrases" are protectable

26   trademark or trade dress, or that they have or could lead a consumer to be confused as to

27

28

United States District Court
Northern District of California

36

1  Defendants' products' origins.  Accordingly, the Court rejects the "code words and phrases" as an

2  independent basis for Plaintiff's unfair competition claims.

3  Plaintiff separately argues that Defendants breached ¶ 1 of the TSA by using the word

4  "Bella."  *See supra*.  The Court finds that Plaintiff has not submitted admissible evidence which

5  creates a triable issue of fact that Defendants did, in fact, use the term "Bella."  *See supra*.

6  Accordingly, the Court rejects the use of the word "Bella" as a basis for Plaintiff's unfair

7  competition claims.

8  The remaining basis for Plaintiff's unfair competition is the allegation that Defendants'

9  copied Plaintiff's trade dress, and in particular the "look and feel" of its website.  Defendants

10  suggest that the Lanham Act may not offer protection for the "look and feel" of a website, Dkt.

11  No. 98 at 21-22, citing *Blue Nile, Inc. v. Ice.com, Inc.* as the only published case Defendants could

12  find that discussed such protection.  478 F.Supp.2d 1240, 1246 (W.D. Wash. 2007).  That case

13  called Lanhan Act protection for a website's "look and feel" a "novel legal theory" and reserved

14  judgment on the issue pending further factual development.  *Id.*

15  Plaintiff misconstrues *Blue Nile* to stand for the proposition that a website's "look and

16  feel" "*can* constitute a protectable trade dress," Dkt. No. 117 at 17 (emphasis added), and states

17  that "[t]wo other unpublished cases exist which reached this same conclusion."  *Id.* (citing

18  *Conference Archives, Inc. v. Sound Images, Inc.*, 2010 WL 1626072 (W.D. Pa. Mar. 31, 2010);

19  *Sleep Sci. Partners v. Lieberman*, 2010 WL 1881770 (N.D.Cal. May 10, 2010)).  *Conference

20  Archives* extensively discusses the leading academic literature on extending trade dress protection

21  to a website's "look and feel," *id.* at *14-16, and does, unlike *Blue Nile*, conclude that that a

22  website's "look and feel" can constitute protectable trade dress.  *Id.* at *16.  However, it did so in

23  the context of a Lanham Act claim to protect the "look and feel" of a website that was, itself, the

24  product.[5]  In contrast, Plaintiff's claim here is for protection of the website it uses to market and

25

26  ─────────────

27  [5] The plaintiff created "a product called Conference Companion" that "display[ed] recorded video in a web page within an Internet browser;" defendant admitted to copying plaintiff's website's underlying code "in order for its product to have a 'consistent' appearance to those previously

28  produced by the [p]laintiff," and also admitted to intentionally "mimic[ing] the 'look and feel' of [the] [p]laintiff's product."  *Conference Archives*, 2010 WL 1626072 at *1.

sell its physical products.  The Court in *Sleep Science Partners* cited *Blue Nile* and *Conference Archives*, and like *Blue Nile*, it considered but ultimately reserved judgment on the issue of whether a website's "look and feel" can constitute the basis for a Lanham Act claim.[6]  *Sleep Sci. Partners v. Lieberman*, 09-04200 CW, 2010 WL 1881770, *5 (N.D. Cal. May 10, 2010) ("The Court need not decide this issue here because Plaintiff has not adequately identified the elements of its website that comprise its alleged trade dress").

Three additional cases from within the Ninth Circuit are instructive.  First, the Court in *Salt Optics, Inc. v. Jand* relied on *Sleep Science*, *Blue Nile*, and *Conference Archives* to conclude that although "the Ninth Circuit has yet to explicate the precise boundaries of trade dress law as applied to the internet . . . [p]recedent from around the country . . . indicates that a website's total 'look and feel' can constitute a protectible trade dress.  2010 WL 4961702, *5 (C.D. Cal. Nov. 19, 2010).  Following *Sleep Science*, however, the court granted the defendant's motion to dismiss, holding that defendant's "mere cataloguing of [the] website's features does not give defendants adequate notice of a plaintiff's trade dress claim." *Id.* (adding that the "inadequacy of such cataloguing is exacerbated when a plaintiff, in a complaint, also 'employs language suggesting that [the listed components] are only some among many' of the elements comprising the alleged trade dress," citing *Sleep Science*, 2010 WL 1881770 at *3).  Second, the Court in *Bryant v. Matvieshen* cited *Sleep Science* for the same proposition in denying a request for a temporary restraining order related to a website trade dress claim.  904 F. Supp. 2d 1034, 1046-47 (E.D. Cal. 2012) ("In order to state a trade dress claim for website design, [plaintiff] needs to clearly define the specific elements that constitute the trade dress; a general description of the site is insufficient").   Third, *SG Servs. Inc. v. God's Girls Inc.* considered a claim for "false designation of origin/trade dress infringement" that claimed trade dress protection for plaintiff's website's look and feel without using that express term.  2007 WL 2315437, at *8 (C.D. Cal. May 9, 2007).  The claim was for infringement of "certain features on the website," including "the color pink," and

---

[6] Again, contrary to Plaintiff's reading.

United States District Court
Northern District of California

the court considered printouts of pages from plaintiff's and defendant's websites for their distinctiveness and likelihood of confusion. *Id.* at *8-11.

Plaintiff here offers some particularity as to the website elements it claims to constitute its website's protectable "look and feel." Its First Amended Complaint includes a list that is not specific to the website,[7] but at the hearing Plaintiff specified that it was claiming the elements described in the declaration of Ingrid Carney. Hr'g Tr. at 21:8-23. Ms. Carney's declaration describes I&I's 2009-2011 efforts to refresh its brand, including through updating its website, and describes the goals and creative purpose of the refresh. Dkt. No. 120 at ¶¶ 3-6. It also describes a list of alleged similarities between Plaintiff's redesigned website and Defendants' redesigned website, "include[ing] but not limited to:

- Logo in feminine script in pastel pink-orange hue in upper left corner of the page.
- Pink and orange script carried throughout the site.
- Close-up of model photos featured from head to mid-thigh, wearing white tanks with jeans, with long naturally wavy hair.
- Model photos feature mouse-over change of whimsical, casual poses to display all angles of the product.
- Featuring Model photos instead of product photos, throughout the site.
- Color and pattern of wallpaper.
- Category sliders.
- Dots for category sliders and similar colors of the dots.
- Placement of models to text in the sliders.
- The general fonts used.
- How the models are posing

Dkt. No. 120 at ¶ 9. Plaintiff's list is more specific than the allegations that were dismissed in *Sleep Science*, 2010 WL 1881770 at *3, or in *Bryant*, 904 F. Supp. 2d at 1046-47. However, as in *Sleep Science*, "Plaintiff employs language suggesting that these components are only some among many," which weighs against Plaintiff's claim, and Plaintiff lists only alleged similarities,

---

[7] *See* FAC at ¶ 72 (describing Plaintiff's trade dress as "including, but not limited to, customer communications, advertisements, press releases, pencil drawings, sizing charts, product inserts, product inserts, product colors, product descriptions and photographs"); *id.* at ¶ 73 (describing "Defendants' website communications, marketing and advertising materials" as "confusingly similar to Plaintiffs Advertising").

1  not a definitive list of the elements constituting Plaintiff's website's "look and feel." 2010 WL

2  1881770 at *3.

3        The Court finds that the "look and feel" of a web site can constitute a trade dress protected

4  by the Lanham Act.  Accordingly, to succeed in its claim Plaintiff must thus show "(1) that its

5  trade dress is inherently distinctive or has acquired secondary meaning; (2) that its trade dress is

6  nonfunctional; and (3) that defendant's product creates a likelihood of consumer confusion."

7  *Autodesk, Inc. v. Dassault Systemes SolidWorks Corp.*, C08-04397 WHA, 2008 WL 6742224

8  (N.D. Cal. Dec. 18, 2008).

9        Distinctiveness

10        "A mark or dress is distinctive when it identifies the particular source of the product or

11  distinguishes it from other products. . . . Correspondingly, a product's trademark or trade dress

12  acquires a secondary meaning when the purchasing public associates the mark or dress with a

13  single producer or source rather than with the product itself.  *Int'l Jensen, Inc. v. Metrosound*

14  *U.S.A., Inc.*, 4 F.3d 819, 824 (9th Cir. 1993).  The Supreme Court has held that "design, like color

15  is not inherently distinctive."  *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 212

16  (2000).  Given the conceptual similarity between "look and feel" and "design," *Wal-Mart* suggests

17  that Plaintiff must show that its website's "look and feel" is distinctive through its secondary

18  meaning; Plaintiff also conceded at the hearing that it must show look and feel of the website has

19  developed secondary meaning.  Hr'g Tr. at 43:11-16.  Plaintiff has offered no direct evidence of

20  distinctiveness, either inherent distinctiveness or through secondary meaning.  *See* Dkt. No. 117

21  (rebutting Defendants' motion to dismiss Plaintiff's unfair competition claims only on the basis

22  that it "has presented direct evidence of customer confusion").

23        However, at the hearing, Plaintiff argued that "evidence of deliberate copying can support

24  an inference of secondary meaning," Hr'g. Tr. at 44:6-10, referring to *Fuddruckers, Inc. v. Doc's*

25  *B.R. Others, Inc.*  826 F.2d 837, 844 (9th Cir. 1987).  *Fuddruckers* "recognize[]d that evidence of

26  deliberate copying is relevant to a determination of secondary meaning," and "in appropriate

27  circumstances, deliberate copying may suffice to support an inference of secondary meaning."  *Id.*

28  (citing *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1014-16 (9th Cir. 1985).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Plaintiff here has submitted evidence of copying, including the declaration of Ms. Carney, Dkt.

2    Nos. 120 at ¶ 9, 120-5 (screenshots of BBM and I&I's websites), as well as evidence that

3    Defendants explicitly instructed some vendors that Defendants wanted BBM's Website to share

4    some visual elements and concepts with Plaintiff's website.  *See* Dkt. No. 92 at 16-17; 10-11; Dkt.

5    No. 93 Exs. J, K, L, S.  Though Defendants dispute Plaintiff's claim, and submit evidence that

6    they were employing a "look and feel" popular among several other websites, Dkt. No. 98 at 22

7    (citing Dkt. Nos. 104 (Pradhan Decl.) at ¶¶25-26; 104-24, 104-25 (screenshots), Plaintiff's

8    evidence raises an issue of triable fact as to distinctiveness.

9          <u>Non-functionality</u>

10         "Trade dress protection extends only to design features that are nonfunctional."  *E.g.*,

11   *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001).  "Functionality is a

12   question of fact."  *Id.* (citing *Fuddruckers,* 826 F.2d at 843).  When multiple elements combine to

13   form one visual whole that constitutes the asserted trade dress, "[t]he fact that individual elements

14   of the trade dress may be functional does not necessarily mean that the trade dress *as a whole* is

15   functional; rather, functional elements that are separately unprotectable can be protected together

16   as part of a trade dress."  *Clicks Billiards*, 251 F.3d at1259 (emphasis in original) (citation

17   omitted).  "[A]s long as there are alternate ways to design a web site, beyond the arrangement

18   protected by the trade dress, the site's interface should not be considered functional."  *Conference

19   Archives, Inc. v. Sound Images, Inc.*, CIV. 3:2006-76, 2010 WL 1626072 (W.D. Pa. Mar. 31,

20   2010).

21         Plaintiff asserts several elements of its website that are likely non-functional, including: the

22   choice to use a "feminine script," the use of "pastel pink-orange hue," the use of "[p]ink and

23   orange script," the "[c]olor and pattern of wallpaper," and the particular poses chosen for its

24   models.  Dkt. No. 120 at ¶ 9.  Additionally, the placement and arrangement of functional elements

25   can produce a non-functional aesthetic whole.  *See Clicks Billiards* at 1259.  "[I]n evaluating

26   functionality as well as the other elements of a trade dress claim, it is crucial that we focus *not* on

27   the individual elements, but rather on the overall visual impression that the combination and

28

41

1    arrangement of those elements create. Trade dress is the composite tapestry of visual effects." *Id.*

2    (emphasis in original).

3          Having asserted several apparently non-functional elements of its website, and having

4    asserted their arrangement and their overall combination, Plaintiff has created a triable issue of

5    fact as to the non-functionality of its website's "look and feel."

6          Likelihood of confusion

7          "Likelihood of confusion [is] a question of fact." *Id.* at 1264 (citing *Levi Strauss & Co. v.*

8    *Blue Bell, Inc.,* 778 F.2d 1352, 1356 n.5 (9th Cir.1985)).  "[T]rial courts disfavor deciding

9    trademark cases in summary judgments because the ultimate issue is so inherently factual." *Levi*

10   *Strauss* at 1356.  Likelihood of confusion is also "the most important element" of the three

11   components of a protectable mark.  *Kendall–Jackson Winery Ltd., v. E. & J. Gallo Winery,* 150

12   F.3d 1042, 1048 (9th Cir.1998).

13               The test for likelihood of confusion is whether a "reasonably
             prudent consumer" in the marketplace is likely to be confused as to
14           the origin of the good or service bearing one of the marks.  *In AMF*
             *Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir.1979), we
15           listed eight factors to facilitate the inquiry: (1) strength of the mark;
             (2) proximity or relatedness of the goods; (3) similarity of sight,
16           sound and meaning; (4) evidence of actual confusion; (5) marketing
             channels; (6) type of goods and purchaser care; (7) intent; and (8)
17           likelihood of expansion. The factors should not be rigidly weighed;
             we do not count beans.
18   *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1132 (9th Cir. 1998).

19          Plaintiff has raised a triable issue of fact as to at least (1) strength of its mark, (2) proximity

20   or relatedness of the goods; (3) similarity of sight, sound and meaning; (5) marketing channels;

21   and (7) intent.  Some *Sleekcraft* factors "are much more important than others, and the relative

22   importance of each individual factor will be case specific." *Brookfield Communications, Inc. v.*

23   *West Coast Entertainment Corp.*, 174 F.3d 1036, 1054 (9th Cir.1999). Here, Plaintiff's evidence

24   as to Defendants' allegedly intentional copying, *see* Dkt. No. 92 at 16-17; 10-11; Dkt. No. 93 Exs.

25   J, K, L, S, and the actual similarity of the websites, *see* Dkt. Nos. 120 at ¶ 9; 120-5 (screenshot

26   comparisons of I&I and BBM websites), create triable issues of fact as to the most critical factors

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    for likelihood of confusion in this case.  Plaintiff's evidence raises an issue of triable fact as to

2    likelihood of confusion.

3           Plaintiff has presented sufficient evidence to create a triable issue of fact as to the elements

4    required to prove its unfair competition claims.  Defendants' motion for summary judgment as to

5    Plaintiff's Counts 6-8 is DENIED.

6           **iii.    Counterclaims 1-3: Intentional Interference With Contractual Relations**

7           Defendants and Plaintiff each move for summary judgment on Defendants' first

8    counterclaim.  For the following reasons, Defendants' motion is DENIED and Plaintiff's motion is

9    GRANTED.

10          At issue in all of Defendants' counterclaims are Plaintiff's's communications with Wayfair

11   LLC and Walmart Inc.  Defendants allege that "IAI caused Wayfair to cancel its Supplier Contract

12   with BBM."  Dkt. No. 92 at 17.  Defendants allege, and the submitted evidence shows, that:

13          • On May 24, 2013, Plaintiff's counsel contacted Walmart and accused BBM of

14             infringing Plaintiff's belly band patents, including the '775 patent.  *See* Dkt. No.

15             94-1 ("May Walmart letter").  Plaintiff's letter also stated that Walmart's marketing

16             and sale of its own "Maternity Belly Band," which Plaintiff said was "nearly

17             identical" to BBM's band, was "also problematic."  *Id.*  The letter demanded that

18             Walmart cease and desist "from the sale and offering for sale of these infringing

19             products."  *Id.*  The May Walmart letter did not mention any past, pending, or

20             contemplated litigation against Defendants, and did not mention either of the

21             parties' settlement agreements.

22          • On June 13, 2013, Walmart forwarded the May Walmart letter to Wayfair as a

23             "notice of receipt of an infringement claim" and asked Wayfair to confirm that as

24             Walmart's supplier of the bands and pursuant to Wayfair and Walmart's

25             "Marketplace Retailer Agreement" that Wayfair indemnified Walmart for any

26             liability for patent infringement stemming from the sale of BBM's bands.  Dkt. No.

27             102-26 ("June Walmart-Wayfair letter").

28

- Wayfair forwarded the letter to Defendants by email on June 18. Dkt. No. 102-26. Wayfair sent a "Notice of Indemnification Claim" letter to Defendants on July 18 and requested confirmation that Defendants acknowledge their obligation to indemnify Wayfair regarding "Wayfair's partner Walmart [being] accused of infringing certain patents based on the sales of certain products, including the BabyBe Mine Belly Band." Dkt. No. 102-27.

- Defendants state that "Wayfair stopped selling BBM's belly bands and stopped providing marketing assistance to BBM at that point," Dkt. No. 102 at ¶ 30, and that "BBM's belly band is no longer sold through the Wayfair website" or "sold through the Walmart website."

- On August 9, Plaintiff's counsel sent a letter to Wayfair (referencing a "recent conversation") that described the PSA and the parties' instant dispute and the ongoing action in this Court. Dkt. No. 104-17. That letter stated that "when our letter of May 24, 2013 was sent to Walmart, Ingrid & Isabel believed that BabyBeMine remained in violation of the Settlement Agreement." *Id.*

In order prove a claim for intentional interference with contractual relations, Defendants must prove the existence of five elements: (1) a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of this contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 960 P.2d 513 (1998).

Plaintiff concedes (1) the valid contract element, *see* Dkt. No. 92 at 17, but maintains that Defendants cannot prove any of the elements of any of its Counterclaims, except for the first element." *See* Dkt. No. 98 at 24-25; Dkt. No. 135 at 11.

Defendants raise at least a triable issue as to Plaintiff's knowledge of the contract; Defendants argue that Robert Yorio, Plaintiff's counsel, communicated with each Walmart and Wayfair by letter prior to and after initiating litigation with Defendants, and submits evidence of those letters. A reasonable juror could conclude that Plaintiff's communications were based on

44

United States District Court
Northern District of California

1    knowledge that Wayfair distributed BBM's products, and therefore must have known that

2    distribution would have been governed by a contract. *See* Dkt. No. 133 at 17-20. Defendants'

3    allegations that Yorio's communication with Wayfair was the intentional, proximate cause of

4    Wayfair ending its contractual relationship with BBM, causing BBM economic harm, also raise

5    triable issues as to elements (4) and (5).

6        Plaintiff challenges Defendants' counterclaim on the basis that Defendants must "prove

7    that IAI engaged in interfering conduct that is wrongful by some legal measure other than the fact

8    of interference itself." Dkt. No. 92 at 18 (*citing Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,

9    11 Cal.4th 376 (1995). I&I is mistaken; the requirement of independent wrongfulness only

10    applies to intentional or negligent interference with *prospective* economic advantage, not to

11    Counter-Plaintiffs' claim for intentional interference with contractual relations. "It is not

12    necessary that the defendant's conduct be wrongful apart from the interference with the contract

13    itself." *Quelimane*, 19 Cal.4th at 55.

14        In addition to challenging the sufficiency of BBM's factual allegations and production of

15    evidence, Plaintiff also claims Defendants' counterclaims must necessarily fail because I&I's

16    accused conduct is shielded from tort liability under the litigation privilege, California Civil Code

17    § 47. Under California Civil Code § 47(b), communications made in or related to judicial

18    proceedings are absolutely immune from tort liability. The litigation privilege is absolute and

19    applies to "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants

20    or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that

21    have some connection or logical relation to the action." *Silberg v. Anderson*, 50 Cal.3d 205, 212,

22    266 Cal.Rptr. 638, 786 P.2d 365 (1990). The purpose of the privilege is "to afford litigants . . .

23    the utmost freedom of access to the courts without fear of being harassed subsequently by

24    derivative tort actions." *Id. at* 213.

25        Courts have applied the litigation privilege to all torts, with the exception of actions for

26    malicious prosecution. *Id.* at 215-16. "Any doubt about whether the privilege applies is resolved

27    in favor of applying it." *Kashian v. Harriman*, 98 Cal.App.4th 892, 913 (2002). California courts

28    have held that the litigation privilege may apply to prelitigation communications, *see Lerette v.*

1   *Dean Witter Org., Inc.,* 60 Cal.App.3d 573, 577 (1976), so long as the communications are made

2   "in good faith and actual contemplation of litigation." *Visto Corp. v. Sproqit Tech.*, 360 F.Supp.2d

3   1064, 1070 (N.D.Cal. Mar.17, 2005) (citing *Newman v. Checkrite Cal., Inc.,* 912 F.Supp. 1354,

4   1374 (E.D.Cal.1995). As the court in *Visto* explained, this may turn on a factual determination.

5   For example, in *Visto,* the court found that there were factual questions as to whether prelitigation

6   demand letters fell under the litigation privilege because the defendant's allegations raised the

7   possibility that at the time the threats of litigation were made, the plaintiff was not seriously

8   contemplating litigation in good faith but was instead using the threats for strategic reasons. *Id.*

9        The litigation privilege also may apply to communications to third parties with an interest

10   in the litigation. *See, e.g., Sharper Image Corp. v. Target Corp.* 425 F.Supp.2d 1056, 1077-78

11   (N.D.Cal.2006) (holding that litigation privilege barred counterclaims asserted against plaintiff

12   pursuing patent and trademark claims where the counterclaims were based on e-mails from

13   plaintiff's attorneys to third parties who purchased the allegedly infringing product from the

14   defendant informing them of the lawsuit and asking them not to carry the defendant's product).

15        The first prong of the litigation privilege test is quite broad. It covers "any publication

16   required or permitted by law in the course of a judicial proceeding to achieve the objects of the

17   litigation, even though the publication is made outside the courtroom and no function of the court

18   or its officers is involved." Silberg, 50 Cal.3d at 216, 266 Cal.Rptr. 638, 786 P.2d 365.

19        Defendants argue that the litigation privilege does not apply in the instant case because

20   "[t]he privilege does not protect statements made to third parties not involved in the litigation."

21   Dkt. No. 133 at 19 (citing *Silberg*, 50 Cal.3d at 219). What *Silberg* actually says is that

22   "republications to nonparticipants in the action are generally not privileged under section 47(2)."

23   *Id.* However, non-litigants possessing a "substantial interest in the outcome of the litigation" are

24   "authorized participants" for purposes of the litigation privilege. *Costa v. Superior Court*, 157

25   Cal.App.3d 673, 678, 204 Cal.Rptr. 1 (1984); *see also Adams v. Superior Court*, 2 Cal.App.4th

26   521, 529 (1992) (noting that "the privilege is not restricted to the parties in the lawsuit but need

27   merely be connected or related to the proceedings"); *Sharper Image*, 425 F.Supp.2d at 1078 (N.D.

28   Cal. 2006). Walmart and Wayfair would have a substantial interest in litigation by Plaintiff that

United States District Court
Northern District of California

United States District Court
Northern District of California

1   accused BBM of selling—including through Wayfair and Walmart—belly bands in violation of

2   the PSA.  As sellers of the belly band, they would indisputably be at least "connected" or "related"

3   to the proceedings.  *See id.* at 1079 (applying the litigation privilege to communication by a

4   Plaintiff patent-holder with Defendant's resellers where a Court finding as to patent infringement

5   in the underlying suit could affect the Defendant and third-parties' business relationship).

6   "[W]here a third party purchases a product that is the subject of an infringement action, a

7   communication to that party informing it of the action has a logical relation to the action because

8   the third party clearly has an interest in the litigation.  *Reid-Ashman Mfg, Inc. v. Swanson*

9   *Semiconductor Serv., L.L.C.*, C-06-4693 JCS, 2007 WL 1394427 (N.D. Cal. May 10, 2007).  The

10   privilege as related to Plaintiff's litigation against Defendants applies as an "absolute" shield for

11   Plaintiff's actions against Defendants' counterclaim.

12          Plaintiff also asserts that the litigation privilege applies because it contemplated litigation

13   against Walmart or Wayfair directly.  *See* Dkt. No. 135 at 11-12.  "When litigation is not yet

14   underway, statements may still meet the requirement of 'some connection or logical relation to the

15   action' if an action is 'contemplated in good faith and under serious consideration.'"  *Sharper*

16   *Image Corp. v. Target Corp.*, 425 F. Supp. 2d 1056, 1078 (N.D. Cal. 2006) (*citing Aronson v.*

17   *Kinsella*, 58 Cal.App.4th 254, 262 (1997)).  However, "it is not the mere threat of litigation that

18   brings the privilege into play, but rather the actual good faith contemplation of an imminent,

19   impending resort to the judicial system for the purpose of resolving a dispute." *Eisenberg v.*

20   *Alameda Newspapers, Inc.*, 74 Cal.App.4th 1359, 1380 (1999) (*citing Edwards v. Centex Real*

21   *Estate Corp.*, 53 Cal.App.4th 15, 35-36 (1997) (emphasis in original)).  Defendants argue that

22   Plaintiff has failed to show that litigation against Walmart or Wayfair was under serious

23   consideration, and that "[t]he 'bare possibility' of litigation is not enough."  Dkt. No. 133 at 19

24   (*citing Edwards v. Centex Real Estate Corp.*, 53 Cal.App.4th 15, 32 (1997).

25          Because the Court finds that the first theory provides Plaintiff with immunity from suit, it

26   need not consider the factual question of how seriously Plaintiff contemplated suing Wayfair or

27   Walmart.

28

United States District Court
Northern District of California

Plaintiff additionally asserts that its rights as a patent owner immunize it from tort liability for "communicat[ion] with a possible infringer in an effort to protect its intellectual property rights." Dkt. No. 92 at 18. Because the Court finds that the litigation privilege provides Plaintiff with absolute immunity from suit, it need not consider this additional of privilege.

Accordingly, Plaintiff's motion for summary judgment as to Defendants first counterclaim is GRANTED and Defendants' motion for summary judgment as to its first counterclaim is DENIED.

### iv.   Counterclaims 2-3: Intentional or Negligent Interference With Prospective Economic Advantage

Plaintiff moves for summary judgment on Defendants' Counts 2-3, for intentional and negligent interference with prospective economic relations. The underlying factual basis for these counterclaims are the same as for BBM's counterclaim for intentional interference with contractual relations. The litigation privilege provides immunity from these claims just as it does from Defendants' first counterclaim. Thus, Plaintiff's motions for summary judgment are GRANTED.

## V.   ORDERS

1. Plaintiff's motions for summary judgment as to Counts 1 and 3 are GRANTED IN PART and DENIED IN PART:

    a. Plaintiff's motion is GRANTED as to Count 1's claim for breach of ¶2.A of the PSA with respect to elements (1) the existence of a contract; (2) performance by the Plaintiff; and (3) a breach by Defendants.

    b. Plaintiff's motion is DENIED as to Count 1's claim for breach of contract with respect to damages.

    c. Plaintiff's motion is GRANTED as to Count 3's claim for breach of ¶ 1 of the PSA with respect to (1) the existence of a contract; (2) performance by the Plaintiff; and (3) a breach by Defendants with regard to: the product descriptions.

48

United States District Court
Northern District of California

1          d.   Plaintiff's Motion is DENIED as to Count 3's claim for breach of contract of ¶

2             1 of the PSA with respect to damages, and entirely with regard to:

3                i.   The mobile website

4                ii.   The Facebook.com page

5                iii.   Printed publications

6    2.   Plaintiff's motions for summary judgment as to Counterclaims 1, 2, and 3 are

7        GRANTED.

8    3.   Plaintiff's motions for summary judgment as to Counts 2, 4, and 5 are DENIED.

9    4.   Defendants' motion for summary judgment as to Counts 2 and 5 are GRANTED.

10    5.   Defendant's motion for summary judgment as to Count 3 is GRANTED IN PART and

11        DENIED IN PART:

12          a.   Defendants' motion is GRANTED with respect to:

13                i.   The mobile website

14                ii.   The Facebook.com page

15                iii.   Printed publications

16          b.   Defendants' motion is DENIED with respect to: the product descriptions.

17    6.   Defendants' motion for summary judgment as to Counts 1, 4, 6, 7, 8, and Counterclaim

18        1 are DENIED.

19      **IT IS SO ORDERED.**

20 Dated: October 1, 2014

21

22                      JOSEPH C. SPERO
                        United States Magistrate Judge

23

24

25

26

27

28